*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KELLY BRENNAN, | ) | |
| | ) | Supreme Court No. S-15576 |
| Appellant, | ) | |
| | ) | Superior Court No. 3HO-12-00166 CI |
| v. | ) | |
| | ) | O P I N I O N |
| RACHAEL BRENNAN, | ) | |
| | ) | No. 7272 – August 10, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Homer, Charles T. Huguelet, Judge.

Appearances: Dan O'Phelan, Law Office of Dan O'Phelan LLC, Homer, for Appellant. Rachael Brennan, pro se, Homer, Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

STOWERS, Chief Justice.

## I.     INTRODUCTION

This appeal presents a variety of issues relating to the divorce of Kelly and Rachael Brennan. At the time of separation, the couple controlled substantial assets, including a successful fishing business, Individual Fishing Quotas (IFQs) that Kelly obtained prior to his marriage to Rachael, and a large home in Halibut Cove. The court ordered Kelly to pay $5,000 per month as interim spousal support. After trial, the superior court determined that the IFQs had become marital property through

transmutation, and it divided most of the marital estate 50/50. The property division included the proceeds from two post-separation sales of IFQs; the court also awarded Rachael half the gross proceeds from the post-trial sale of the couple's fishing vessel, the F/V ALASKA.

Kelly appeals. He argues that the IFQs were his separate property not subject to division; he also challenges several other aspects of the court's property division, arguing that the court abused its discretion in failing to account for various tax liabilities, payments, alleged damage to marital property, and other factors that he contends unfairly favored Rachael. We conclude that the superior court applied the wrong legal standard to its transmutation analysis regarding the IFQs. We therefore reverse the determination that the IFQs were marital property, and reverse the award to Rachael of proceeds from post-separation IFQ sales. We remand for the superior court to reconsider these issues as well as the overall equitable property distribution, and to explain its reasoning for awarding Rachael gross rather than net proceeds from the sale of the F/V ALASKA. We find no error or abuse of discretion regarding the other points raised on appeal.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Kelly Brennan is a lifelong fisherman. He formed the fishing business Eclipse, Inc. with his first wife, Mary, in 1981. Through his work as a fisherman, he acquired IFQs from the federal government, giving him the right to harvest specified amounts of halibut and sablefish.[1]

---

[1]    As we explained in *Ferguson v. Ferguson*, 928 P.2d 597, 598 (Alaska 1996), "[t]he IFQ program is a federal regulatory response to various problems in the halibut and sablefish fisheries . . . [which] replaces the previous 'open access' regulatory regime with a limited access system." Under the IFQ program, annual commercial

(continued...)

Kelly and Rachael Brennan met in the summer of 1991 when Rachael was in her early 20s and Kelly was in his early 30s. Rachael was working for a fish buyer at the time, but she left her job to be with Kelly and began helping him with his fishing business. The couple married in July 1994. During their marriage, Kelly's settlement agreement with his ex-wife required Kelly to make payments to her, which both he and Rachael labeled "IFQ payments." Kelly's ex-wife apparently also had a lien on the IFQs. Kelly was responsible for all of the administrative tasks related to registering and using IFQs during his marriage to Rachael.

The fishing business was very successful and consistently produced high spendable income. With the help of proceeds from the sale of some IFQs, the couple built the largest home in Halibut Cove at 6,500 square feet with an apartment, barn, dock, and outbuildings on 19.5 acres.

The parties dispute the extent of their respective contributions to the fishing business. Kelly fished and maintained the F/V ALASKA, and delegated all bookkeeping to Rachael. Rachael testified to running errands for the business, outfitting and cleaning the boat, helping obtain parts for the boat, paying bills, maintaining financial records, tracking licenses, and performing other tasks.

---

[1]    (...continued)
fishing quotas of halibut and sablefish are distributed among qualified "quota share holders." 50 C.F.R. § 679.40 (2017). Halibut and sablefish fisheries are managed under separate quota systems. *Id.* To qualify for an IFQ, a person must have owned or leased a vessel that commercially fished halibut or sablefish during 1988, 1989, or 1990. *Id.* § 679.40(a)(2)-(3). The size of each quota share is determined in proportion to the share holder's history of landings from 1984 to 1990 for halibut, and from 1985 to 1990 for sablefish. *Id.* § 679.40(a)(4). Quota shares and annual quotas are transferable (with some restrictions), and so can be resold for value. *Id*. § 679.41.

The couple separated in April 2011 and split a substantial amount of what were apparently marital funds at the time.[2] Kelly continued to receive the income produced by the fishing business. He bought land and built a house in Seldovia that he titled in his new girlfriend's name, and in October 2011 he sold a number of IFQs to one of his deckhands for $110,022.

Rachael, who has a high school diploma, lived off what money Kelly chose to give her. She claimed this consisted of an initial $84,000 after separation — of which she later returned $24,000 — plus an additional $15,000 in the summer of 2012. Kelly did not initially contest those figures — although he later claimed the initial payment was $86,000 — but he asserted that Rachael received additional amounts, for a net total of over $150,000 in the first few months after separating, in addition to the $15,000 he gave her in 2012. The bulk of the difference appears to be a $74,000 transfer which Kelly claimed went to Rachael, but which Rachael asserted went to their joint "tax account" and not to her individually. Rachael also used her credit card and loans from friends to support herself.

B.    Proceedings

Kelly filed a complaint for divorce in May 2012. Rachel filed a motion for interim support, interim possession of the marital home, and attorney's fees in August 2012. In his opposition, Kelly requested financial records and an accounting of what Rachael had done with the money he had already given her. After a hearing in November 2012, the superior court awarded Rachael exclusive possession of the Halibut

---

[2]    The exact amount that Kelly and Rachael split when they separated is unclear. Kelly's pre- and post-trial briefs and the trial court's findings of fact listed this initial transfer as $86,000, but various affidavits indicate that it was $84,000, and testimony on this point was unclear. Bank statements in the record from around that time do not show either amount, but do show a transfer of $80,000 shortly before the separation as well as additional transfers and payments on the same day in the amounts of $8,000, $6,000, $4,443, and other smaller amounts.

Cove home, ordered the parties to prepare to sell the home, and ordered Kelly to pay Rachael $5,000 per month in interim spousal support effective November 1. The court found that this amount would allow Rachael to keep the property in a condition that could be shown to potential buyers. The court also ordered Kelly to pay Rachael $10,000 in attorney's fees. Kelly did not pay the attorney's fees, and did not consistently pay the court-ordered spousal support.

In May 2013 the court ordered Kelly to sell a batch of IFQs worth about $83,905 so he could pay spousal support arrears and Rachael's attorney's fees. The IFQs were technically held by Eclipse, Inc.; the court later explained that Kelly used corporate assets as if they were his personal assets, and it therefore treated them as such, effectively disregarding the corporation for purposes of the property division at divorce.[3] The court ordered that $18,000 be used to pay off a lien Kelly's ex-wife apparently had on the IFQs; that money for any taxes on the sale be put in an escrow account; that the broker's fee be paid; and that a sum of $50,000 be put in Rachael's law firm's trust account for the payment of spousal support arrears, on-going spousal support for June and July 2013, and attorney's fees.

Kelly thereafter filed motions requesting that Rachael be required to disclose financial records relating to the marital estate in order to find out whether she was really spending $4,000 a month on property maintenance as she claimed. Rachael opposed Kelly's motions, yet the court failed to rule on them.

After a two-day trial in July 2013 the court issued findings of fact and conclusions of law. First, the court found that Kelly's previously separate IFQs were transmuted during the marriage into marital property. The court reasoned that because Kelly gave Rachael an active role in the fishing business for "nearly 20 years," made

---

[3]     Neither party has challenged the superior court's decision to treat corporate assets as personal. We therefore do the same.

payments using marital income from the fishing business for his ex-wife's interest in the IFQs and also sold some of his IFQs to purchase marital property, Kelly demonstrated both the conduct and intent necessary to transmute presumptively separate property obtained before marriage into marital property subject to division. At the time of trial, these remaining IFQs were worth $682,868.

Second, the court determined that a 50/50 division of the marital assets was equitable despite Rachael's lack of skills and Kelly's status as a successful fisherman.[4] The court considered Kelly's contribution of his successful pre-marital business to the marriage, his age, and medical issues that would eventually limit his ability to fish commercially. Consequently, the court awarded the fishing business, including the IFQs, to Kelly, but ordered that Rachael be paid her 50% share of the business value from the sale of the Halibut Cove home and property. At the time the court issued its decision, the house had not sold but was listed at approximately $2.8 million dollars.

Third, the court stated that "[t]he parties' personal property was valued and/or allocated on the record at trial. The remainder of the couple's personal property [was] to be sold at auction and the proceeds divided . . . 50/50." The court denied Kelly's subsequent motion for clarification on this issue.

Fourth, the court ruled that Kelly was "entitled to an offset for the $15,000 provided to [Rachael] in 2012, and an amount equal to one half of [the] pretrial spousal support" because the amount "included funds needed for upkeep of the jointly owned home." The court also ordered Kelly to pay Rachael $1,000 per month for one year in spousal support and $10,000 in attorney's fees.

Finally, the court recognized that Kelly claimed Rachael had failed to rent an apartment on the couple's property and allowed it to deteriorate after he left the home,

---

**4** Rachael did not file a cross-appeal and does not challenge the court's equitable distribution.

but the court provided no offset for the alleged damage. The court awarded Rachael $55,000 from the proceeds from Kelly's October 2011 IFQ sale to his deckhand for $110,022. The court also ordered that Rachael be paid $35,000 as her half of the proceeds of the sale of the F/V ALASKA, marital property that Kelly had sold for $70,000 following trial.

Kelly filed an Alaska Civil Rule 60(b) motion raising the issue of the $74,000 transfer, which he claimed was deposited into Rachael's personal account, and he asked for an evidentiary hearing on the issue. The court denied his motion and request for an evidentiary hearing. Kelly appeals.

## III. STANDARD OF REVIEW

"[T]he characterization of property as separate or marital may involve both legal and factual questions."[5] "Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions."[6] "Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment."[7] We review the equitable allocation of property for an abuse of discretion.[8] "Additionally, the trial court must render findings of ultimate fact that support any decreed property division; the findings must be explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision."[9]

---

[5] *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013) (quoting *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006)).

[6] *Id.* (citing *Odom*, 141 P.3d at 330).

[7] *Id.* (quoting *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005)).

[8] *Id.* (citing *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991)).

[9] *Id.* (quoting *Doyle*, 815 P.2d at 368).

"Whether a superior court's findings are sufficiently clear is a legal question, which we review de novo."[10]

A motion for "clarification" that asks the court to reconsider substantive matters is treated as a motion for reconsideration, and its denial is reviewed for abuse of discretion.[11] The award of interim spousal maintenance under AS 25.24.140(a)(2) is committed to the sound discretion of the trial court and reviewed for abuse of discretion.[12] "The superior court must base its interim support order on sufficient factual findings concerning the parties' needs and ability to pay."[13]

The trial court's failure to rule on Kelly's request for disclosure effectively acted as a denial of that request; we review the denial of a request for disclosure for abuse of discretion.[14] "Whether there was a violation of due process is a question of law, which we review de novo."[15] However, we will "disregard any error or defect in the

---

[10] *Id.* (citing *Miller v. Miller*, 105 P.3d 1136, 1140 (Alaska 2005)).

[11] *See Johnson v. Johnson*, 239 P.3d 393, 404 (Alaska 2010) (treating a "motion to clarify" that did not address merely "clerical error" as a motion for reconsideration); *Baseden v. State*, 174 P.3d 233, 238 (Alaska 2008) (reviewing the denial of a motion for reconsideration for abuse of discretion).

[12] *Johnson v. Johnson*, 836 P.2d 930, 933 (Alaska 1992) (citing *Burrell v. Burrell*, 537 P.2d 1, 7 (Alaska 1975)).

[13] *Beal v. Beal*, 88 P.3d 104, 112 (Alaska 2004) (citing *Johnson*, 836 P.2d at 934).

[14] *See Taylor v. Johnston*, 985 P.2d 460, 463, 466 (Alaska 1999); *Simone H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 284, 287 (Alaska 2014).

[15] *Patrick v. Municipality of Anchorage, Anchorage Transp. Comm'n*, 305 P.3d 292, 297 (Alaska 2013) (citing *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 207 (Alaska 2000)).

proceeding which does not affect the substantial rights of the parties."[16]  The denial of a Civil Rule 60(b) motion is generally reviewed for an abuse of discretion,[17] as is the denial of a request for an evidentiary hearing on the subject of a Rule 60(b) motion.[18]

## IV.  DISCUSSION

Under Alaska law, equitable division of marital assets involves three steps: (1) determining the specific property available for distribution; (2) valuing the available property; and (3) equitably dividing property available for distribution.[19]  In order to complete the first step, the court must characterize assets as separate or marital, the latter being subject to division.[20]  Property acquired by one spouse prior to the marriage is separate property, which is not divisible but subject to "invasion" only "when the balancing of the equities between the parties requires it."[21]  Marital property generally includes all property acquired during the marriage, except for property received by one spouse as a gift or inheritance, and property acquired in exchange for separate property which is maintained as separate.[22]  However, initially separate property may "transmute"

---

[16]     Alaska R. Civ. P. 61.

[17]     *Dickerson v. Williams*, 956 P.2d 458, 462 (Alaska 1998) (citing *Nelson v. Jones*, 781 P.2d 964, 968 (Alaska 1989)).

[18]     *See Stinson v. Holder*, 996 P.2d 1238, 1242 (Alaska 2000).

[19]     *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013) (citing *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991)).

[20]     *Kessler v. Kessler*, 411 P.3d 616, 618 (Alaska 2018).

[21]     *Id.* (quoting AS 25.24.160(a)(4)).

[22]     *Horning v. Horning*, 389 P.3d 61, 64 (Alaska 2017) (citing *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005)).

into marital property through an implied interspousal gift.[23]  Once the trial court has determined what property is marital and valued that property, it must equitably divide it between the parties.  An equal division of property is presumptively equitable,[24] but the trial court has broad discretion in this area.[25]

Kelly argues that the superior court erred by (1) finding that the IFQs were marital property subject to division via the doctrine of transmutation; (2) failing to offset the value of personal property orally awarded to Rachael at trial in its written property division; (3) failing to credit Kelly for overpayment of spousal support; (4) failing to address alleged payments to Rachael of $74,000 and $20,000 or to provide an evidentiary hearing on the subject of the $74,000 payment when raised in a Rule 60(b) motion; (5) failing to account for damage to the marital apartment allegedly caused by Rachael in its property division; (6) failing to rule on requests for records regarding the cost of maintaining the marital home;  and (7) failing to credit Kelly for tax payments he made on the post-separation sale of IFQs and the F/V ALASKA.

### A.  The Superior Court Applied An Incorrect Legal Standard When Determining That The IFQs Transmuted To Marital Property.

We have established that an IFQ creates a property interest that may be subject to division in a divorce.[26]  The superior court found that the IFQs were all based on work Kelly performed before he married Rachael, so the IFQs were his separate

---

[23]  *Kessler*, 411 P.3d at 619 (citing *Sparks v. Sparks*, 233 P.3d 1091, 1094, 1096 (Alaska 2010)).

[24]  *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006) (citing *Brooks v. Brooks*, 733 P.2d 1044, 1058 (Alaska 1987)).

[25]  *See id.*; *Bellanich v. Bellanich*, 936 P.2d 141, 143 (Alaska 1997) ("The trial court has broad discretion in fashioning a property division.").

[26]  *Ferguson v. Ferguson*, 928 P.2d 597, 600 (Alaska 1996).

property when he entered the marriage.[27] However, the superior court found that because Kelly made payments for the IFQs to his ex-wife using marital income from the fishing business, because Kelly sold IFQs to pay for the marital home, and because Rachael had been working in the fishing business for nearly 20 years, the evidence established an "intent to treat the IFQs as marital." On that basis, the superior court determined that the IFQs had all been transmuted to marital property and were subject to division.

Kelly challenges the superior court's transmutation finding by arguing that (1) no evidence supports that the parties took the actions relied on by the court to find transmutation and the basis for the finding is clearly erroneous and (2) the court's finding that the parties' alleged conduct demonstrated an intent on his part to treat the IFQs as marital was based on a misapplication of our case law.

As we recently explained in *Kessler v. Kessler*, our prior opinions have not always been precise in describing the transmutation doctrine.[28] For the superior court to find transmutation by implied interspousal gift, it is not enough to show that a married couple has demonstrated "an intent . . . to treat one spouse's separate property as marital property."[29] First, the relevant intent is not that of the "married parties" or the "couple," but only that of the owning spouse — the spouse whose separate property is in

---

[27] *See id.* at 600 (citing *Chotiner v. Chotiner*, 829 P.2d 829, 832 (Alaska 1992)); *see also Johns v. Johns*, 945 P.2d 1222, 1226 (Alaska 1997) (citing *Ferguson*, 928 P.2d at 600) ("[A] spouse's interest in an IFQ is his or her separate property to the extent that the size of the quota share is attributable to labor performed prior to the marriage, and marital property to the extent that it is attributable to labor performed during the marriage.").

[28] 411 P.3d at 619.

[29] *Id.* (citing various cases using this and similar phrases).

question.[30]  Second, the intent that must be shown is not merely intent to "treat" separate property as marital, in the sense of sharing the property during the marriage.[31]  Rather, the relevant question is whether the owning spouse intended "to 'donate' or 'convey' separate property to the marital unit or marital estate."[32]  The following sections discuss each of the trial court's factual findings and how they relate to this standard.

### 1.    IFQ sales during the marriage

The superior court's transmutation determination was based in part on its finding that IFQs "were sold to pay for marital assets."  Kelly argues that there was no evidence of any sale of IFQs during the marriage.  But Kelly testified that he sold two partial IFQs to buy property in Halibut Cove that was titled in Rachael's name.  This testimony is consistent with concessions in Kelly's brief.  In light of these concessions and evidence in the record, the superior court did not clearly err in finding that IFQ sales occurred during the marriage.  However, as we noted in *Thomas v. Thomas*, the use of some separate property to cover marital expenses does not necessarily render other separate property marital.[33]  The sale of separate property IFQs to fund the construction of a marital home titled in Rachael's name is not relevant to determining whether Kelly had the intent to convey the remaining IFQs to the marital estate.  To the extent this sale

---

**30**    *Id.* (citing *Sparks v. Sparks*, 233 P.3d at 1094, 1096 (Alaska 2010); *Thomas v. Thomas*, 171 P.3d 98, 107 (Alaska 2007); 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5:69, at 665 (3d ed. 2005)).

**31**    *Id.*

**32**    *Id.*; *see also Sparks*, 233 P.3d at 1094 ("[S]eparate property may be transmuted to marital property if the owner intends to convey the property to the marital unit and the owner's conduct demonstrates that intent."), *overruled on other grounds by Engstrom v. Engstrom*, 350 P.3d 766, 771 (Alaska 2015).

**33**    *See* 171 P.3d at 107-08.

was evidence of Kelly's intent to convey *any* separate property to the marital estate, that property is the Halibut Cove home.

## 2. Rachael's contribution to the fishing business

The transmutation analysis was also based in part on Rachael's work "as bookkeeper and onshore liaison for the [fishing] business" for "nearly 20 years." Kelly argues that "there was little to nothing admitted at trial that showed Rachael worked at all with the fishing business" and no evidence as to when she may have performed this work. There certainly is conflicting testimony on this point, but there is ample support in the record for the court's factual determination that Rachael kept the books and acted as an onshore liaison for the fishing business when Kelly was at sea. The couple's long time friend testified to observing Rachael doing various work required to operate the fishing business. Rachael testified to running errands for the business, outfitting and cleaning the boat, helping obtain parts for the boat, paying bills, maintaining financial records, tracking licenses, and performing other tasks. Kelly conceded that for the most part he delegated all bookkeeping to Rachael, though he repeatedly characterized her contributions as minimal. Given the support in the record and the deference we give to the credibility determinations of the trial court,[34] the court did not clearly err in finding that Rachael contributed to the fishing business.

But in order for the non-owning spouse's contribution to a separate property business "to be relevant to the owning spouse's donative intent, 'the non-owning spouse's "participation must be significant and evidence an intent to operate jointly." ' "[35] Although we can glean from the trial court's analysis that it considered

---

[34] *See Sheffield v. Sheffield*, 265 P.3d 332 (Alaska 2011) (citing *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

[35] *Kessler*, 411 P.3d at 621 (quoting *Abood v. Abood*, 119 P.3d 980, 988
(continued...)

Rachael's contribution "significant," the court did not appear to consider whether that contribution specifically evidenced an intent on Kelly's part to operate the fishing business jointly and therefore to convey to the marital unit either the IFQs or the corporation that held them, Eclipse, Inc. Because the court's findings of donative intent are not "explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision,"[36] they are insufficient to support the transmutation determination.

We note, however, that even in the absence of donative intent sufficient to support a finding of transmutation for either the business or the IFQs, Rachael's contributions may still have given her an interest in the fishing business under the doctrine of active appreciation. Under this doctrine, some portion of a separate-property business might be marital property if marital contributions to the business caused some appreciation in its value during the marriage.[37]

### 3. IFQ purchases during the marriage

Finally, the trial court's transmutation analysis was based on its finding that "marital funds were used to purchase the IFQs." Kelly asserts that "[t]here was never any evidence at trial that any IFQs were purchased during Kelly's marriage to Rachael" nor any evidence that Kelly "used marital income to pay any expenses for the IFQs." The critical disagreement between Kelly and the court is over the evidence for and characterization of Kelly's payments to his ex-wife Mary, who apparently had liens

---

[35]    (...continued)
(Alaska 2005)).

[36]    *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013) (quoting *Doyle v. Doyle*, 815 P.2d at 368 (Alaska 1991)).

[37]    *See Kessler*, 411 P.3d at 622 & n.32 (citing *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006); *Schmitz v. Schmitz*, 88 P.3d 1116, 1125 (Alaska 2004)).

against Kelly's IFQs. Kelly asserts the evidence only supports that he paid down a general debt arising from his first marriage. The court viewed the payments as the purchase of IFQs with marital income.[38]

The evidence surrounding the settlement agreement between Kelly and his first wife and payments pursuant to that agreement is scant, as the superior court acknowledged, but it is sufficient to support a finding that the payments to Mary were for the IFQs specifically, and not for a "general debt." When questioned about the terms of his prior divorce settlement, Kelly testified that he "had to reimburse [Mary] for some halibut shares" but that he was "done paying her" at the time of trial. At a status hearing, Kelly testified that Mary had a lien on the court-ordered sale of IFQs, and the IFQ sale document noted that Mary "has a lien against these shares with a balance due of approximately $18,000." And as the court noted in its findings, Kelly's financial declaration from October 2012 lists a yearly expense of $17,500 labeled "IFQ payment."[39] Finally, given that the record is devoid of any other sources of income apart from the couple's fishing business, it was reasonable for the court to infer that these IFQ payments were made with marital income.

This evidence is sufficient to support the trial court's finding that Kelly "made payments on the IFQs throughout the entire marriage," but it does not follow that

---

[38] We note briefly that whether the IFQs were purchased during the marriage is not strictly speaking relevant to a transmutation analysis: if IFQs were indeed purchased with marital funds during the marriage, they would be presumptively marital property and the transmutation doctrine would not be in issue. *See Kessler*, 411 P.3d at 618. This legal error aside, if the IFQs were purchased during the marriage, the trial court's ultimate conclusion that the IFQs were marital property would not be erroneous; thus, the relevant question is whether the court clearly erred in finding that the IFQs were purchased during the marriage.

[39] The financial declaration refers to monthly income and expenses, but Kelly completed it based on yearly figures.

he was "purchasing" the IFQs from Mary. There is no indication that Mary had a present ownership interest in the IFQs during Kelly's marriage to Rachael — if she did, she would not have needed a lien on them. At most, the evidence indicates that Mary may have had the status of a secured creditor, similar to a mortgagee, with the "IFQ payments" going towards reducing the balance of a secured debt. As we explained in *Kessler*, most equitable distribution jurisdictions treat the use of marital funds to pay down a secured debt on separate property as a contribution towards acquisition that creates a marital interest in that property.[40] But this doctrine is distinct from that of transmutation, as such contributions create only a partial interest in property based on the actual amount of the contributions.[41]

In short, the trial court's factual findings underlying its transmutation determination — the sale of IFQs to purchase the marital home, the "purchase" of IFQs through the payments to Mary, and Rachael's contribution to the fishing business — are largely irrelevant to the question of transmutation, and certainly insufficient to establish that Kelly intended to convey the IFQs to the marital estate. In concluding that "intent to treat the IFQs as marital ha[d] been established" by the evidence on these issues, it is clear that the superior court's transmutation analysis was based on an incorrect legal standard. We therefore reverse the transmutation determination. On remand, the superior court should reconsider transmutation under the standard described here and in *Kessler*. The parties are also free to litigate whether, alternatively, Rachael may have had a marital property interest in the IFQs or the corporation that held them through the doctrines of active appreciation or marital contribution to separate debt.

---

[40]   *Kessler*, 411 P.3d at 622 (citing 1 TURNER, *supra* note 29, § 5:26, at 399-400; *id.* § 5:24, at 385-86). We have not yet decided whether to adopt this approach under Alaska law; because the parties have not briefed this issue, we do not do so at this time, but the parties are free to litigate this on remand.

[41]   *See* 1 TURNER, *supra* note 29, § 5:26, at 399-400.

**B.** **The Superior Court Did Not Abuse Its Discretion By Not Offsetting The Value Of Personal Property Awarded To Rachael.**

Kelly next argues that Rachael received a greater value in personal property than he did in the court's oral distribution of specific personal property items at trial — around $24,700 more according to our calculations[42] — but the court failed to account for this disparity in its written findings and conclusions and erred in denying Kelly's motion for clarification on this issue. We disagree.

A superior court's allocation of marital property is reviewed for abuse of discretion and we reverse such an award only if it is clearly unjust.[43] The denial of motions for clarification, like those for reconsideration, are reviewed for abuse of discretion.[44] The superior court was well aware that it had allocated specific items of personal property at trial; it stated it had done so in its findings of fact. The court then allocated the rest of the personal property on a 50/50 basis. In response to Kelly's motion for clarification the court reaffirmed its oral personal property allocation at trial and incorporated the portion of the transcript addressing personal property allocation into its findings of fact. In crafting an equitable allocation, the court explicitly considered and balanced numerous statutory factors, including the parties' relative earning capacity, age, health, financial condition, conduct, and circumstances. The court also noted that, but for Kelly's age and medical condition, it ordinarily would have awarded a larger portion

---

[42] According to Kelly, Rachael was awarded another boat named SLIMER ($11,000), two horses ($2,200), a Ford pickup ($5,000) and diamond earrings ($3,000) while Kelly was awarded a dump truck ($1,500). Our review of the record indicates that SLIMER was actually valued at only $5,000, but Rachael also received an additional 18′ skiff valued at $11,000.

[43] *Urban v. Urban*, 314 P.3d 513, 515 (Alaska 2013) (citing *Barnett v. Barnett*, 238 P.3d 594, 597 (Alaska 2010)).

[44] *See Johnson v. Johnson*, 239 P.3d 393, 404 (Alaska 2010); *Baseden v. State*, 174 P.3d 233, 238 (Alaska 2008).

of the marital assets to Rachael. Thus, the court's decision to reaffirm the oral personal property allocation at trial and to divide the remainder equally was not clearly unjust but reflected a careful consideration and balancing of relevant factors, given the court's view of the case and the relative needs of the parties. We conclude that it was not an abuse of discretion.

However, if the superior court on remand determines that the IFQs remained entirely or partially separate property, it follows that in total less property was marital and subject to distribution. In that case, a 50/50 split of marital property may no longer be equitable, and the court may in its discretion revisit the overall division of marital property.

### C.     The Superior Court Did Not Abuse Its Discretion By Not Crediting Kelly For Alleged Overpayments Of Spousal Support.

Kelly argues that he paid too much spousal support because Rachael inflated the amount needed to maintain the marital home and failed to disclose the extent of her assets to the court. Kelly asks that we remand and require the trial court to give him credit for the resulting overpayment.

Rachael asserted in her motion for interim spousal support that at the time Kelly moved out of the marital home in April 2011 the couple split marital money, each taking around $84,000 — of which Rachael later returned $24,000 — and that she received an additional $15,000 from Kelly in the summer of 2012. In addition, she declared in her affidavit and reported in her financial declaration that she had about $4,000 in monthly expenses maintaining the Halibut Cove property and paying taxes, utilities, and other costs, and that she "ha[d] no money to pay the bills."

In response, Kelly relied on a bank statement to argue that he had actually transferred more income to Rachael — about $152,342 — in the few months after separating in addition to $15,000 he gave her in the summer of 2012. Kelly asserts on appeal that Rachael did not include the receipt of these additional funds in her financial

declaration, that he paid for taxes, heating fuel, and property maintenance performed by third parties, and that Rachael therefore misrepresented her expenses.

At trial Rachael admitted that the expenses on her financial declaration were just estimates and did not reflect actual payments. She also admitted that since separation Kelly had paid all the property taxes on the Halibut Cove property, which was inconsistent with her estimates in her financial declaration. Kelly testified, as he argues now, that there was no explanation or evidence as to how all of the money he gave Rachael was spent.

Kelly is correct that there is little documentation showing how Rachael spent the funds she received from Kelly after separation and before the interim support award. But the question here is not how the funds Rachael received were ultimately spent, but whether the court's interim spousal support award was properly based on "sufficient factual findings concerning the parties' needs and ability to pay,"[45] or to put it another way, whether the court abused its discretion in awarding Rachael $5,000 per month.[46] We conclude that there was support for the court's award and that the award was not an abuse of discretion.

First, while a detailed accounting of past expenses would have been a stronger basis for the prospective award, the court's determination was not without support. Rachael asserted in her motion for interim support and supporting affidavit that her $4,000 maintenance number included work needed to make the house marketable, utility costs, significant transportation costs between Homer and Halibut Cove, and support for her while working to maintain the property. While Kelly asserted at trial that it did not cost $4,000 to maintain the home, he acknowledged that making improvements

---

[45]    *Beal v. Beal*, 88 P.3d 104, 112 (Alaska 2004) (citing *Johnson v. Johnson*, 836 P.2d 930, 934 (Alaska 1992)).

[46]    *See Johnson*, 836 P.2d at 933.

to the house would cost more than merely maintaining the condition of the property, and he did not address the other costs Rachael included in her maintenance figure, such as costs of transportation.

Moreover, at the hearing preceding its order, the court noted that Rachael was essentially fired from her job with the family fishing business and that $5,000 per month to maintain a large property did not seem excessive. Later in its findings of fact the court made specific findings as to the amounts of money Rachael received after separation and her comparatively limited job skills vis-à-vis Kelly's status as a successful commercial fisherman; the court also explained its desire to keep the property in good condition so it could be sold. This demonstrates that the court took into account the parties' needs and ability to pay, crafted its award to preserve — and ultimately sell — the marital home, and provided for the reasonable and necessary living expenses of the parties during the pendency of the divorce.[47] We conclude the court's decision to award $5,000 a month in interim spousal support and not to credit Kelly for alleged overpayments of spousal support was not an abuse of discretion.

**D.**  **The Superior Court Did Not Abuse Its Discretion Or Deny Kelly Due Process By Not Explicitly Addressing Two Alleged Transfers Occurring Shortly After Separation.**

Kelly contends that shortly after the couple's separation a $74,000 transfer was made to Rachael's account, not to the couple's tax account as Rachael claimed; he argues that the superior court failed to address this issue, failed to allow an evidentiary hearing, and failed to grant relief under Civil Rule 60(b), thereby abusing its discretion and denying Kelly due process. Kelly also asserts on appeal that he gave Rachael an additional $20,000 in 2012, on top of the $15,000 he gave her in the summer of that year.

---

[47]     *See Beal*, 88 P.3d at 112 (citing *Johnson*, 836 P.2d at 934).

Kelly's suggestion that there was an additional payment of $20,000 was not raised before the trial court, and Kelly has not identified any evidence in the record showing that he paid $20,000 *in addition to* the earlier $15,000. The only evidence in the record that Kelly paid Rachael $20,000 in 2012 is a statement of Rachael's total "cash flow" for 2012 and testimony about that document. That document shows a transfer of $20,000 from Kelly to Rachael, but does not mention the transfer of $15,000 that same year, suggesting that the larger amount includes the smaller. And Kelly testified at trial that the $20,000 he paid her in 2012 consisted of the $15,000 transfer, plus $5,000 of court-ordered spousal support. Because the trial court credited Kelly both for the $15,000 payment and for the payment of interim spousal support, it appears that the trial court effectively addressed the entirety of the $20,000 Kelly now claims he paid to Rachael in 2012.

A review of the trial transcript reveals limited testimony about a tax account, and none in relation to a $74,000 payment. What it does show is that Rachael testified the "tax account" and the money in it was used to pay for business expenses and taxes. Additional declarations submitted in relation to Kelly's Rule 60(b) motion add little. Rachael declared in an affidavit that $74,000 in "additional funds" were transferred to the couples' joint "tax account" in April 2011 shortly after the couple separated. Kelly declared that his accountant never informed him that Rachael paid a tax matching the one described in her affidavit.

On this record, the court's decision not to address the payment in its decision implies that it credited Rachael's testimony and determined the money had gone to pay marital taxes or bills. Accordingly, there was no need to credit any party with the payment because it was marital income used to satisfy a marital expense. We conclude that the court's decision not to address the $74,000 transfer was not an abuse of discretion.

Moreover, refusing to provide relief from the judgment or an evidentiary hearing on this issue under Rule 60(b) was not an abuse of discretion. Kelly based his request for relief on Rule 60(b)(1) mistake, surprise, or excusable neglect, (3) fraud, and (6) "any other reason justifying relief."[48] Relief was not justified under any of these categories. First, to gain relief under Rule 60(b)(1), "a party must show not only 'neglect,' but a valid 'excuse' therefor."[49] But Kelly's request was not based on any neglect, excusable or otherwise, in raising the issue of the $74,000, nor on any mistake or surprise. On the contrary, he included the money transfer in the summary of payments attached to his opposition to Rachael's motion for interim support and he raised the issue in both his pre- and post-trial briefs. Because Kelly himself raised the issue with the court before trial, he cannot claim entitlement to relief based on mistake, surprise, or excusable neglect. Nor can he complain that the trial court did not provide for a post-trial evidentiary hearing, because the issue was raised at trial.

Second, Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those that are factually incorrect."[50] It provides relief where a judgment was entered based on misconduct that materially "prevented the losing party from fully and fairly presenting his case or defense."[51] Again, Kelly was able to raise the issue of the $74,000 before the trial court. Mere uncertainty or disagreement as to the nature of a payment does not show that the judgment was unfair or fraudulently obtained.

---

[48]     Alaska R. Civ. P. 60(b). While the language of clause (6) indicates a broad catch-all provision, we have held that it is limited to "extraordinary circumstances." *O'Link v. O'Link*, 632 P.2d 225, 229-30 (Alaska 1981).

[49]     *Dickerson v. Williams*, 956 P.2d 459, 465 (Alaska 1998) (citing *Rill v. State, Dep't of Highways*, 669 P.2d 573, 576 (Alaska 1983)).

[50]     *Babinec v. Yabuki*, 799 P.2d 1325, 1333 (Alaska 1990) (quoting *McCall v. Coats*, 777 P.2d 655, 658 (Alaska 1989)).

[51]     *Id.* (citing *McCall*, 777 P.2d at 658).

Third, the factual dispute discussed above does not indicate any "extraordinary circumstance" that would justify relief under Rule 60(b)(6). This catch-all clause of Rule 60(b) "is reserved for extraordinary circumstances not covered by the preceding clauses."[52] We have held that there are four factors to be considered before setting aside a property division under Rule 60(b)(6): whether (1) the fundamental, underlying assumption of the division has been destroyed; (2) the parties' property division was poorly thought out; (3) the property division was reached without the benefit of counsel; or (4) the property in dispute was the parties' principal asset.[53] On this record, none of these factors are present in relation to the $74,000 money transfer, and there are no other indications of any extraordinary circumstance.

A motion under Civil Rule 60(b) does not "allow relitigation of issues that have been resolved by the judgment."[54] The court heard and considered evidence pertaining to the tax account and the $74,000 money transfer and apparently did not credit Kelly's argument. Because none of these categories support relief under Rule 60(b), we conclude the court's denial of Kelly's motion for relief and request for an evidentiary hearing was not an abuse of discretion. Furthermore, because Kelly could and did present arguments and evidence relating to the money transfer both before and after trial, we conclude the court did not deny Kelly due process.

---

[52]    *Johnson v. Johnson*, 394 P.3d 598, 602 (Alaska 2017) (quoting *O'Link*, 632 P.2d at 229).

[53]    *Id.* at 602-03 (citing *Hopper v. Hopper*, 171 P.3d 124, 130 (Alaska 2007)).

[54]    *Morris v. Morris*, 908 P.2d 425, 429 (Alaska 1995) (quoting *Burrell v. Burrell*, 696 P.2d 157, 163 (Alaska 1984)).

**E.     The Superior Court Did Not Abuse Its Discretion By Not Accounting For Alleged Damage To The Marital Apartment Caused By Rachael.**

Kelly alleges that Rachael removed cabinets from an apartment on their property and made other changes to the apartment.  He argues she violated court orders, completely destroyed the apartment, and deprived him of its use and rental income.  He asserts that the superior court erred by not including "distribution for the unilateral damage to the apartment by Rachael" in its decision.  We disagree.

While the record supports that Rachael removed carpeting and vintage 1980s cabinets from the apartment, Kelly's claims that the apartment was destroyed, that the cabinets were damaged, and that he lost rental income were contradicted by the testimony of multiple witnesses.  For example, the couple's friend testified that the apartment had been painted, described the changes as renovations, said that the cabinets were covered and being stored in the boathouse, and did not believe any fixtures had been removed from the apartment.  Rachael testified that she wanted to update the apartment to make the property more marketable.  Rachael and another friend testified that the apartment had not typically been rented out.  Furthermore, the court explicitly addressed Kelly's claim of damage in its findings when discussing whether there had been an unreasonable depletion of marital assets, and chose not to account for this claim in its distribution of marital assets.  Given the conflicting evidence in the record and the court's explicit treatment of Kelly's claim, its decision not to account for alleged damage to the apartment in its property division was not an abuse of discretion.

**F.     The Failure To Rule On Kelly's Pre-Trial Motions For Disclosure And Request For A Hearing Was Harmless.**

Kelly argues the superior court abused its discretion and denied him due process when it failed to rule on his motions for disclosure of financial records and for disclosure of records of maintenance on the marital home, and his request for a hearing.  We conclude the court's failure to rule on these motions was harmless.  In *Taylor v.*

*Johnston*, a medical malpractice case, we addressed a court's failure to rule on the plaintiff's discovery motion to obtain information to impeach the defendant at trial.[55] Because the court permitted the complaining party to introduce substantial amounts of impeachment evidence at trial, accuse the defendant of misrepresentation and falsifying his medical credentials, and offer testimony supporting those allegations, we concluded that the court's failure to rule on the motion to reopen discovery was harmless.[56] Like in *Taylor*, though the court failed to rule on Kelly's motions, it allowed Kelly to question Rachael about her statements on her financial declaration, permitted Kelly to accuse her of misrepresenting information to the court, and allowed Kelly to offer his own testimony and that of another witness to contradict Rachael's maintenance claims. Thus, as in *Taylor*, the court's failure to rule was harmless.

We analyze Kelly's due process claim under the familiar three-part test set out in *Mathews v. Eldridge*.[57] We consider and balance the private interest affected, the risk of erroneous deprivation of such interests through the procedures used and value of additional procedural safeguards, and the government's interest, including the function involved and the burden of additional procedural requirements.[58] Here, the potential overpayment in spousal support, a purely economic interest, is "not [a] particularly compelling private interest[]";[59] the state has an interest in efficiently adjudicating divorce cases; and considering that Kelly was able to present evidence and testimony to

---

[55] 985 P.2d 460, 466 (Alaska 1999).

[56] *Id.*

[57] 424 U.S. 319 (1976).

[58] *Blaufuss v. Ball*, 305 P.3d 281, 286 (Alaska 2013) (citing *Borkowski v. Snowden*, 665 P.2d 22, 27-28 (Alaska 1983); *Mathews*, 424 U.S. at 335).

[59] *See Hertz v. State, Dep't of Corr.*, 230 P.3d 663, 672 (Alaska 2010) (citing *Midgett v. Cook Inlet Pre-Trial Facility*, 53 P.3d 1105, 1112 (Alaska 2002)).

counter Rachael's, both the risk of erroneous overpayment of spousal support and the added benefit of additional disclosures or an additional hearing were relatively small.[60] Even if the superior court erred in failing to rule on Kelly's motions for disclosure and request for a hearing, we conclude that any error, including any due process error, was harmless.

G.     **The Superior Court Must Explain Its Reasoning For Awarding Rachael Pre-Tax Proceeds For The Sale Of The F/V ALASKA.**

Kelly argues that the superior court abused its discretion because its division of marital property did not credit him for taxes he paid on the sale of the F/V ALASKA. Kelly sold the vessel for $70,000 after trial, and the superior court awarded Rachael exactly half of this amount, $35,000. Thus, the superior court appears to have awarded Rachael pre-tax gross proceeds rather than net proceeds from this sale.

The superior court has broad discretion in valuing and allocating property in a divorce.[61] But the findings and reasoning underlying any property division "must be explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision."[62] In light of Rachael's relative lack of ability to generate income in comparison to Kelly, and the prospect that Rachael would receive very little income until the Halibut Cove property sold, it may well have been reasonable for the court to favor Rachael when distributing the sale proceeds, as these were liquid assets capable of immediate distribution. But without some indication of the trial court's actual reasoning, this is mere speculation on our part. On remand, the superior court must

---

[60]     *See id.*

[61]     *Odom v. Odom*, 141 P.3d 324, 332 (Alaska 2006) (citing *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)).

[62]     *See Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013) (quoting *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991)).

address this issue.

**H.** **Because We Reverse The Superior Court's Transmutation Finding Regarding The IFQs, We Also Reverse The Superior Court's Orders Awarding Rachael Part Of The Proceeds From IFQ Sales.**

Kelly raises the issue of the superior court's treatment of post-separation IFQ sales. In May 2013 the superior court ordered Kelly to sell some IFQs to pay spousal support arrears and Rachael's attorney's fees. The court revisited this IFQ sale in a July 2014 order responding to Rachael's motion for clarification and ordered that Rachael receive half of the remaining proceeds after taxes and brokers fees were taken out. The court also awarded Rachael "50 percent of the proceeds" of the October 2011 IFQ sale for $110,022.

Because we reverse the superior's transmutation finding, the court's orders granting Rachael half the proceeds of these sales cannot stand. Without a valid transmutation finding or other basis for concluding that the IFQs were marital property, the IFQs were Kelly's separate property. As such, the IFQs and the proceeds from their sale were not subject to division. The superior court does have the authority to invade a party's separate property "when the balancing of the equities between the parties requires it,"[63] but in the absence of a finding to that effect, we cannot uphold an order dividing proceeds from the sale of separate property.[64]

Kelly also argues that the superior court abused its discretion by not crediting him for paying taxes on both of these sales. With respect to the 2013 sale, the court order specifically provided that money for taxes on the sale be paid from the

---

[63] AS 25.24.160(a)(4); *Green v. Green*, 29 P.3d 854, 860 (Alaska 2001).

[64] This holding does not affect the superior court's order for part of the proceeds to go towards spousal support arrears and attorney's fees, as those payments do not constitute a division of marital property.

proceeds. This means that regardless of whether the IFQs were separate or marital property, the court order made Kelly responsible for the tax payment in direct proportion to his ownership interest, and he was therefore not entitled to a credit.[65]

With respect to the 2011 sale, it appears the superior court intended for Rachael to receive 50% of pre-tax proceeds: in the July 2014 order, the court ordered Kelly's attorney to pay Rachael $55,000 from the proceeds of the sale, almost exactly half of the $110,022 gross proceeds. Because we cannot uphold awarding Rachael any of the proceeds without a valid basis for treating them as marital property or for invading separate property, we do not need to address whether this particular award was an abuse of discretion. But we again note that the superior court has discretion to divide the proceeds from the sale of marital property unevenly if doing so is necessary to achieve an equitable distribution of property, so long as the court's reasoning is "explicit and sufficiently detailed to give this court a clear understanding of the basis of the trial court's decision."[66]

## V. CONCLUSION

We AFFIRM the superior court's decision not to offset the value of personal property awarded to Rachael, its decision not to credit Kelly for alleged overpayments of spousal support, its denial of Kelly's Civil Rule 60(b) motion, and its decision not to account for alleged damage to the marital apartment. We conclude that any error in the superior court's failure to rule on Kelly's motions for disclosure was harmless. However, we REVERSE the superior court's determination that all of the

---

[65] In other words, if the IFQs were Kelly's separate property then Kelly was solely responsible for paying the taxes on the sale. If, on the other hand, the IFQs were marital property then Kelly alone did not pay the taxes; the marital estate did. Either way, Kelly was not entitled to a credit for his share of the tax payment.

[66] *See Beals*, 303 P.3d at 459 (quoting *Doyle*, 815 P.2d at 368).

IFQs were marital property, and REVERSE the awards to Rachael of proceeds from the post-separation sale of IFQs. We REMAND for proceedings consistent with this opinion for reconsideration of whether there existed a marital interest in the IFQs or in Eclipse, Inc. In light of its characterization of the IFQs and the fishing business, the superior court on remand should reconsider the award of IFQ sale proceeds to Rachael, and should explain or amend its award of gross pre-tax proceeds from the sale of the F/V ALASKA. The superior court may in its discretion reevaluate on remand the overall property division to ensure an equitable distribution. We do not retain jurisdiction.