# IN THE COURT OF APPEALS OF IOWA

No. 21-0122
Filed September 22, 2021

IN RE THE MARRIAGE OF JODIE LYNN KELLER
AND MARK ALAN KELLER

Upon the Petition of
**JODIE LYNN KELLER,**
    Petitioner-Appellee,

**And Concerning**
**MARK ALAN KELLER,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Clarke County, John D. Lloyd, Judge.

Mark Keller appeals an award of physical care, the distribution of assets, and the denial of spousal support. **AFFIRMED AS MODIFIED AND REMANDED.**

David E. Brick and Allison M. Steuterman of Brick Gentry, P.C., West Des Moines, for appellant.

Donna R. Miller of Miller, Zimmerman & Evans, PLC, Des Moines, for appellee.

Considered by Tabor, P.J., and Greer, J., and Doyle, S.J.*

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**TABOR, Presiding Judge.**

Jodie and Mark Keller divorced after nearly two decades of marriage. Mark now challenges the physical care arrangement for their middle child, M.A.K.; the child support calculation; the division of assets; an order to return funds; and the denial of spousal support. Jodie defends the decree and seeks appellate attorney fees. Because the district court did equity on the financial matters, we affirm those decisions. But because the decree lacks a compelling reason for splitting physical care of the siblings, we modify the determination of M.A.K.'s physical care and remand for child support recalculation. Finding the parties are on similar fiscal footing, we decline Jodie's request for appellate attorney fees.

## I. Facts and Prior Proceedings

The Kellers were married in 2002. They have five children,[1] three of whom were minors during the divorce proceedings.[2] After their separation, Mark and Jodie enjoyed joint physical care of the children. But over time that arrangement deteriorated. Rather than continue to split time between their parents' homes, the two daughters—in the words of the district court—"chose sides." M.E.K. decided to live with Mark, while her younger sister, M.A.K., stayed with Jodie. M.E.K. turned eighteen while this appeal was pending and will no longer be subject to the custody arrangements.

At the divorce trial, Mark requested physical care of M.E.K. Jodie did not contest this arrangement. But Mark *did* object to M.A.K. staying with Jodie. After

---

[1] Before their marriage, Jodie had two children, who were adopted by Mark.
[2] J.Z.K. was born in 2007; M.A.K. was born in 2005; M.E.K. was born in 2003.

hearing testimony from Mark, Jodie, and M.A.K.'s therapist, the district court split custody, granting each parent physical care of one of the daughters.[3]

Since 1994, Jodie has worked for the Iowa Department of Human Services (DHS) in central Iowa. In the years before their divorce, Jodie earned between $75,000 and $82,000. By contrast, Mark's career took him farther from home. He mostly stayed on the water, at various times working in offshore drilling, on a cruise ship, and as a commercial fisherman. In 2005, Mark bought a boat and a red snapper permit, which he personally used in his commercial fishing enterprise. But a change in federal regulation transformed the permit into an Individual Fishing Quota (IFQ). To maximize his profits, Mark leased the IFQ rather than use it himself. Mark treated those fees as his primary income. In the years before their separation, the IFQ lease produced between $108,000 and $130,000 annually.

During the divorce proceedings, Jodie retained her DHS job. But she sought a new position within the agency. As with any new job, this position came with some benefits and some drawbacks: offering more stable and regular hours, but no chance for overtime and a lower income. Like Jodie, Mark's employment prospects have changed since the divorce proceedings began. He has continued to lease the IFQ. But health issues and the realities of (part-time) single parenthood ended his mariner days. And although he has applied for more traditional forms of employment, he hasn't landed a job yet.

The IFQ played a starring role in district court, and it has an encore performance in this appeal. First, the court determined the IFQ was marital

---

[3] Unlike his older sisters, J.Z.K.'s physical care arrangement did not change. He continues to spend more-or-less equal time with both parents.

property, and, as such, subject to equitable distribution. Over Mark's objection, the court divided the IFQ equally between Mark and Jodie. The court also ordered Mark to reimburse $20,000 in IFQ income he took from the joint bank account.

Second, as an income-generating asset, the IFQ factored into the court's spousal and child support analyses. Because Jodie and Mark had different plans for their share of the IFQ—to sell and to retain, respectively—the court calculated different incomes from the asset. Whereas Mark was assigned $67,000—one-half of the IFQ's historic earnings—Jodie was responsible for $19,500—the expected return of investment from the IFQ's sale. Using these numbers, the court denied Mark's request for spousal support, finding he was self-sufficient. Similarly, these figures factored into the child support calculation. In round numbers, Mark owed a net amount of $200 per month while all three children were minors, $900 after M.E.K. turned 18, and $40 after M.A.K. turned 18.

Mark now appeals, raising five issues: (1) the physical care determination for M.A.K., (2) the child support calculation, (3) the IFQ's fate, (4) the $20,000 reimbursement, and (5) the spousal support denial. Jodie resists on each point and requests appellate attorney fees.

## II. Scope and Standards of Review

We review dissolution cases de novo. Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). We give weight to the fact findings of the district court, particularly on witness credibility, but they do not bind us. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Because the particular facts of each case are vital to the resolution, "precedent is of little value." *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009) (citation omitted).

**III. Analysis**

**A. Should the parents have joint physical care of the two youngest children?**

Mark first challenges the award of M.A.K.'s physical care to Jodie. He contends the parents should have joint physical care of both M.A.K. and J.Z.K.

We first consider whether joint physical care is desirable under these circumstances. There is no presumption for joint physical care. *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Instead, an award hinges on the child's best interests. *Id.* When considering joint physical care, we turn to this non-exhaustive list of factors: (1) the promotion of stability and continuity; (2) the degree of communication and mutual respect between the parents; (3) the level of discord and conflict before the divorce; and (4) how well the parents agree on matters of routine care. *Id.* at 697–700.

As for the first factor, both Mark and Jodie participated in child care during their marriage.[4] And, early in the divorce proceedings, they entered a temporary agreement providing for joint physical care of all three children. For about a year, Mark and Jodie operated under that agreement without major issue. It was only five weeks before trial that M.A.K. refused to honor the shared-care arrangement. But even when their daughters each aligned with one parent, the other parent tried to repair the rifts. For example, Mark urged M.E.K. to reconcile with Jodie. And Jodie encouraged M.A.K. to communicate with Mark. But most telling is that the

---

[4] Because Mark's mariner work frequently took him away from home, Jodie was often the sole caregiver. But when Mark wasn't on a job, he was a stay-at-home father.

shared-care arrangement continues for their youngest child, J.Z.K. Given these circumstances, we believe joint physical care is appropriate under the *Hansen* factors.

We next consider whether joint physical care is in M.A.K.'s best interests. We begin with the presumption that "siblings should usually not be separated." *In re Winter's Marriage*, 223 N.W.2d 165, 166 (Iowa 1974) (citation omitted). This presumption recognizes siblings should not become ships passing in the night after a divorce. Instead, because siblings benefit from constant association, courts must identify a good and compelling reason before ordering separation. *In re Marriage of Smiley*, 518 N.W.2d 376, 380 (Iowa 1994); *see* Iowa Code § 598.41(5)(a) (2019) (setting out that care "determination should be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child").

Here the district court's findings of fact leave us wanting for that reason. And the trial record itself is no more fruitful. On the surface, separating the teenage sisters cements battle lines that formed in the months before the divorce trial. Apparently, those fronts reflected the teenagers' preferences. Granted, M.A.K.'s physical-care preference is a valid factor. *See In re Marriage of Behn*, 416 N.W.2d 100, 101–02 (Iowa Ct. App. 1987). But "[d]eciding [physical care] is far more complicated than asking children with which parent they want to live." *Id.* at 101. For the purposes of appeal, we must consider the reasons behind her decision.

And here M.A.K.'s reasoning gives us pause. In large part, her desire to live with Jodie was motivated by a dispute with her older sister, M.E.K.[5] The record shows M.A.K. "didn't like living at Mark's anymore, because she [was] not getting along with [her sister]." Jodie testified that M.A.K. was upset because M.E.K. "didn't have any rules or expectations." And M.A.K. preferred to live with Jodie "because she enjoyed having her own bedroom at her mother's where at [Mark's] house, she had to share a bedroom with her sister."

It is true, in some cases, the negative influence of one sibling over another may be cause to separate them. *See, e.g.*, *In re Marriage of Jones*, 309 N.W.2d 457, 461–62 (Iowa 1981). But that situation is not present here. M.A.K.'s frustration with M.E.K. is typical of teenage siblings. M.A.K. complains M.E.K. "seems to get away with more, [and] do whatever she wants." M.A.K. prefers her own bedroom, away from her sister.

But those reasons do not suggest the sisters need to be separated or that the court should have enshrined what may have otherwise been a temporary dispute. More importantly for Mark, the district court did not provide sound reasons under Iowa Code section 598.41(5)(a) for denying his request for joint physical care of M.A.K.

What's more, we can't ignore the unfortunate consequence of the district court's physical-care decision: it limited the contact between M.A.K. and her

---

[5] The district court did not acknowledge this dispute in its findings—instead noting M.E.K. and M.A.K. "have chosen sides" and refuse to have anything to do with the other parent. While the record shows continuing animosity between Jodie and M.E.K., even Jodie acknowledged M.A.K. desired a "meaningful relationship" with her father.

younger brother, J.Z.K. Nothing in the record suggests these two siblings, who remain impacted by the decree, have a troubled relationship. The modification urged by Mark would provide these youngest siblings the benefit of a continued close association through their teenage years. Finding no compelling reason to separating these siblings, we believe joint physical care is appropriate for both J.Z.K. and M.A.K.[6] We remand for the district court to determine an appropriate shared care schedule for M.A.K., along with J.Z.K., and to recalculate any child support obligation.[7]

### B. Did the district court equitably divide the Individual Fishing Quota?

Upon a dissolution of marriage, a court must divide all marital property equitably between the parties. Iowa Code § 598.21(5). This statute makes "no effort to include or exclude property from the divisible estate by such factors as the nature of the property of the parties, the method of acquisition, or the owner." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005).

Mark's main point of contention is the IFQ, which began as a permit to fish for red snapper. Likely because Iowa is landlocked, our appellate courts have not addressed this kind of asset before. So we turn to Alaska cases, where the issue is more common. The Alaska Supreme Court has held that "an IFQ creates a property interest that may be subject to division in a divorce." *Brennan v. Brennan*, 425 P.3d 99, 106 (Alaska 2018) (citing *Ferguson v. Ferguson*, 928 P.2d 597, 600 (Alaska 1996)); *see also McGee v. McGee*, 974 P.2d 983, 989 (Alaska 1999)

---

[6] We do not disturb M.E.K.'s physical care arrangement because it was uncontested and she is no longer a minor.

[7] Because we modify the physical care award, we do not consider Mark's objections to the testimony from M.A.K.'s therapist relaying the child's preferences.

(holding quota shares were based on joint efforts during the marriage and thus were divisible assets).

Mark does not outright contest the status of the IFQ as a marital asset, but rather argues its division was inequitable. Because the IFQ was "his asset," "his means of income," "in his name," and Jodie "did little with the IFQ," he believes the district court should have awarded the IFQ to him in its entirety.

Because we are more familiar with farming than fishing quotas in Iowa, Mark likens the IFQ to an owner-operated farm. He contends the court should have granted the whole IFQ to him rather than dividing it. Indeed, our supreme court has sometimes authorized one party to retain farm ownership. *See In re Marriage of Callenius*, 309 N.W.2d 510, 514–15 (Iowa 1981) (recognizing "considerable effort that must be expended" and potential to "decimate the assets of the parties" absent the farmer's skill); *see also In re Marriage of Anderson*, 243 N.W.2d 562, 563 (Iowa 1976) (affirming award of farm to one party when "in the best interest of all concerned").

But Mark was not the owner-operator of the IFQ; its value existed independent of his skills. True, Mark's skills were a factor when the IFQ was a fishing permit. But those days are gone. Since the federal government converted[8] Mark's snapper permit into an IFQ, Mark's primary role has been finding a lessee. While that role requires effort, it does not compare to the owner-operator in

---

[8] The quota related to the individual permit's historic fishing numbers between 1990 and 2004. Because that period predated Mark's ownership, his own fishing contributions did not impact the quota or the IFQ's value. That said, the record shows that Mark anticipated the possibility of the conversion and bought *this* red snapper permit because it might yield a large quota.

*Callenius.* And, like the district court, we are not convinced by Mark's testimony "that he spends any significant time in the management of the IFQ." Mark has leased the IFQ to the same individual almost exclusively. What's more, the leasing process is simple: the price is determined mainly by snapper's price per pound and a government-run website is used to carry out the lease.

Simply put, Mark did not act as skipper; the ship was on cruise control. This is not a case in which the IFQ's value would sink but for Mark's efforts. And as the district court aptly stated: "As far as this record shows, division of the IFQ will only result in each party receiving . . . [a] percentage . . . while the total income realized from the entirety of the IFQ will remain the same." So rather than acting as an owner-operator, Mark received a passive income from the IFQ. Because this situation differs from *Callenius*, the district court was free to divide the IFQ as it saw fit, so long as the overall distribution was equitable.

And here the district court reached a near-equal final distribution. So we decline to disturb its decision.[9] *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009) ("While an equal division of assets accumulated during the marriage is frequently considered fair, it is not demanded.").

### C. Did the district court equitably distribute the joint account funds?

Mark also asserts his right to the IFQ's earnings because it was "his income." Acting on this belief, Mark took $104,000 from a joint account before trial

---

[9] In his motion under Iowa Rule of Civil Procedure 1.904(2), Mark requested sixty—rather than fifty—percent of the IFQ. We see no reason why that distribution would be more equitable than the present one. We give district courts wide latitude for asset distribution. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). We only reverse where there is a "failure to do equity." *Id.* (quoting *In re Marriage of Romanelli*, 570 N.W.2d 761, 763 (Iowa 1997)).

and moved it into a separate account. But the court ordered Mark to reimburse $20,000 to Jodie.

Contesting this decision, Mark points out Jodie took $25,000 from the joint account. Because the court did not order Jodie to return any money, Mark calls foul. But the court considered the overall finances of the parties. And before ordering repayment, the court decided each party could keep $25,000 from that account. Even after this credit and other offsets, Mark held $45,000 more in joint funds than Jodie. He is not entitled to relief on the reimbursement issue.

### D. Did the court correctly calculate Jodie's income?

Having divided the IFQ and redistributed some of its past income, the district court next considered its future earnings. Based on prior years, the court determined Mark would earn $67,000 annually from leasing his remaining half of the IFQ. But the court settled on a different number for Jodie. Unlike Mark, Jodie intended to sell her half of the IFQ.[10] And to quote the district court: "allowing [Jodie] to sell the asset and show no income from it for child support purposes would produce a substantial injustice." *See* Iowa Ct. R. 9.11(1). So, the court imputed $19,500 annually to Jodie, representing the expected profits from the investment of sale proceeds.

Highlighting the disparate treatment, Mark claims error. Mark argues it is unfair for Jodie to sell her half of the IFQ and the court should have imputed rental income to her. Jodie responds that she "has chosen to forego the annual lease income from the IFQ and sell it." She notes that "she may be reducing the lifetime

---

[10] Before trial, Jodie sold her portion of the IFQ subject to it being awarded to her.

benefit she will receive from the asset, but that is her choice, and as long as she is not doing it to intentionally reduce her child support obligation, she cannot be penalized for her decision." She contends the court's decision to impute interest income to her from the sale proceeds corrects any inequality.

We agree. Jodie will not be earning the IFQ rental income that Mark asks us to assign her. *See* Iowa Ct. R. 9.5(1) (defining gross monthly income as the "reasonably expected income from all sources"). Because the district court reasonably calculated Jodie's income, we will not alter its decision. Her imputed annual income of $92,175 will be appropriate for determining child support on remand.

### E. Spousal Support

Finally, Mark requests spousal support. He seeks traditional spousal support of $2000 per month until Jodie's retirement. This type of aid is awarded for "so long as a spouse is incapable of self-support." *In re Marriage of Francis*, 442 N.W.2d 59, 63–64 (Iowa 1989). When deciding whether one spouse is entitled to spousal support, we consider factors such as the parties' ages, earning potentials, and distribution of assets. Iowa Code § 598.21A. And we only disturb a spousal-support decision if it fails to do equity. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012).

With these factors in mind, we conclude the district court's denial of support achieved equity between the parties. Mark is self-sufficient without help from Jodie. He will earn nearly $70,000 a year from his half of the IFQ. And should he

obtain employment, his available resources will increase.[11] On top of his income, Mark received assets valued at over one million dollars in the property division. Under these circumstances, we do not think the district court acted unfairly in declining to award Mark spousal support. *See In re Marriage of Mann*, 943 N.W.2d 15, 23 (Iowa 2020) (upholding district court's denial of spousal support where spouse seeking support benefited from equal division of substantial marital property).

### F. Appellate attorney fees

Jodie requests $9,205 in appellate attorney fees. We award attorney fees as a matter of discretion, not one of right. *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). We consider Jodie's needs, whether she had to defend on appeal, and Mark's ability to pay. *See id.* Although Jodie successfully defended against Mark's challenges to the economic aspects of the decree, like Mark, she is self-supporting, and awarding appellate fees is unnecessary.

**AFFIRMED AS MODIFIED AND REMANDED.**

---

[11] As the district court noted, even a full-time minimum wage job would increase Mark's annual income by over $10,000. Mark does not dispute this figure. And despite her position at trial—namely that Mark could earn more than minimum wage—Jodie does not claim error either.