*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ANGELA THIELE, | ) |
| | ) Supreme Court No. S-17256 |
| Appellant, | ) |
| | ) Superior Court No. 3KN-16-00221 CI |
| v. | ) |
| | ) O P I N I O N |
| KIM EDWARD THIELE, | ) |
| | ) No. 7484 – October 2, 2020 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran, Judge.

Appearances: Roberta C. Erwin, Palmier Erwin, LLC, Anchorage, for Appellant. Shana Theiler, Walton, Theiler & Winegarden, LLC, Kenai, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Stowers, Justice, not participating.]

CARNEY, Justice.

## I. INTRODUCTION

The primary dispute in a couple's divorce concerned the classification of the husband's medical practice as separate or marital property. The superior court determined that the practice had neither transmuted nor actively appreciated during marriage and therefore was not marital property. The court also declined to award the wife attorney's fees or reimbursement for the cost of an expert witness. The wife appeals the court's determination that the medical practice was not marital property and its

refusal to award attorney's fees or costs. Because the trial court did not err, we affirm both decisions.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Angela and Kim Thiele married in February 2009 and separated in January 2016. Angela filed for divorce in February 2016.

Kim received a Doctor of Osteopathic Medicine degree in 1980. After working as an employee in another doctor's practice, he established his own professional corporation in 2001 "to provide medical care to the general public."[1] Kim worked as an independent contractor at other practices for the next ten years.

During this time his business had few fixed assets because the doctors that employed him covered most of the overhead of running the medical practice. Kim's business received 30% of the revenue he brought in from seeing patients, which Kim deposited into the corporation's bank account. Business expenses were paid out of the corporate bank account, as was Kim's salary.

Kim's practice grew from treating approximately five patients per day in 2001 to treating about 60 per day by the time he left one clinic to relocate to another. Despite a non-compete agreement with the first clinic, many of Kim's patients followed him to his new location.

---

[1]    Alaska law allows licensed professionals to establish a professional corporation pursuant to the Professional Corporation Act. *See generally* AS 10.45.010-.510. Generally, these corporations function much like regular corporations, but they limit directors, officers, and shareholders to those individuals licensed to provide the professional service indicated in the articles of incorporation. *See* AS 10.45.050-.060. These corporations provide limited liability to their shareholders, shielding them from the negligent acts of other shareholders while continuing to hold them personally liable for their own negligent acts. *See* AS 10.45.140.

In 2011 Kim decided to open his own practice rather than continue to work as an independent contractor. He obtained a business license and hired an office manager to help him with the transition. At about the same time Angela contributed $15,000 of her own funds to the marital estate. She helped Kim decorate the office, and she participated in discussions with Kim about taking over another doctor's practice or starting his own practice. Angela also worked as a receptionist and administrative assistant, answering the phone, greeting patients, and performing other administrative tasks as needed.

### B.    Proceedings

The trial began in January 2017. The court devoted the first day of trial to determining whether Kim's medical practice was his separate property or part of the marital estate.

Angela testified that she believed she and Kim owned the business together. She stated that her $15,000 contribution to the marital estate was to help pay off Kim's credit cards so that he could buy supplies for the practice. But Kim countered that he was always careful to keep business and personal expenses separate. He claimed that any money Angela contributed to the marital estate was to help with the couple's personal land purchases, not to help the business. Kim testified that his business took out a $145,000 loan to buy supplies, office equipment, and furniture. By the end of 2015, Kim's business owned two trucks, office equipment, computers, and other fixed assets totaling over $160,000.

Angela also introduced evidence at trial indicating that she was a corporate officer; she was listed as the secretary or treasurer in the minutes of various business meetings. But under cross examination, she admitted that she was secretary in name only, that Kim created all the minutes, most of which were created after the meetings took place, and that he directed her to sign the documents. Kim testified that the

meetings where he designated Angela as a corporate officer were really personal dinners where little, if any, business was discussed; he would document what was happening within the business at the time as part of the minutes to make it look like a business discussion took place. He testified that he then declared them business meetings to deduct them from his taxes as a business expense.

After hearing testimony from Angela, Kim, and Kim's office manager, the court found that Kim's medical practice had not transmuted from his separate property to marital property during the marriage. But the court deferred deciding whether the business had actively appreciated. The court stated that it "[did] not have enough evidence . . . to determine if Kim's medical practice appreciated during the marriage and whether that appreciation [was] marital." The court's order also noted that "Angela has the burden of proving whether there was active appreciation in value of Kim's medical practice."

When trial reconvened in December, Angela presented Donavon Rulien as an expert witness whom she had hired to perform an active appreciation analysis of Kim's medical practice. Rulien testified about his analysis and explained aspects of a report he authored that detailed his methodology and conclusions.

Rulien valued Kim's medical practice as of December 31, 2015, and in his report he discussed three potential approaches for valuing the business. Each approach used a different methodology to determine a business's value based on its assets, income, and comparisons to similar businesses in the market.

Rulien concluded that Kim's business fit the criteria for an income-based approach: its "recent historical normalized results of operations . . . [were] expected to be indicative of [its] future operations" and its "future returns [were] expected to grow at a predictable rate." Despite concluding that an income-based method of valuation was

appropriate, Rulien valued Kim's business using an asset-based approach and assigned it a value of $245,000 as of December 31, 2015.[2]

Rulien's report did not value Kim's business in February 2009 when Angela and Kim married.[3] But he testified that he valued it at zero as of December 31, 2010. He explained that the business had negative retained earnings in 2011, which meant that the business had no assets prior to 2011 and therefore no value prior to that year. When questioned about why he failed to consider any data before 2011, and particularly from 2009 when Kim and Angela married, Rulien added that he also valued the business at zero as of the date of marriage.[4]

Rulien's report was admitted into evidence over Kim's objection. Kim later requested and was granted an opportunity to present evidence to rebut Rulien's opinion. The court scheduled an additional trial day in March 2018 to hear from Kim's expert, Susan Spyker.

Spyker described three separate determinations necessary for a proper active appreciation analysis: (1) a valuation on the date of separation; (2) a valuation on

---

[2] Rulien valued the business using the adjusted net asset method, which takes the book value of each of the business's tangible assets and adjusts them to their fair market value. He rejected the market-based approach as unsuitable for valuing the business.

[3] Rulien testified that his initial report stated Angela had requested only a valuation of Kim's business. But after a call from Kim's attorney inquiring about the lack of a valuation on the date of marriage, and further contact with Angela's attorney, Rulien changed the report to state he was "hired to value the active appreciation" of Kim's business.

[4] Rulien also testified that although calculating the amount of appreciation during the marriage required a beginning value, he believed that Kim's company came into existence only in 2011 after the marriage. As a result he did not believe it had any value in February 2009.

the date of marriage; and (3) an analysis of any appreciation between those dates to determine what portion was due to active marital contributions as opposed to passive factors. She faulted Rulien's analysis for skipping the last two determinations.

Spyker stated that without a valuation on the date of their marriage, it was "impossible to determine if there was any appreciation at all, either active or passive." She also criticized how Rulien applied the asset-based approach to conclude Kim's business had actively appreciated. She testified that because Rulien used the adjusted net asset method to value the business in 2015, accounting standards required the same methodology to be used to value the business in 2009. That method required an analysis of trends over the five years before the relevant date; Spyker testified that Rulien should have looked at trends for the five years prior to 2009, which he did not do, as well as the five years before 2015.

Spyker also believed that any increase in the business's value was likely due to passive, rather than active, factors. The factors Spyker believed were important included Kim's preexisting patient relationships, increases in fee schedules, a shift in the percentage of patients with government health plans, income from product sales and other ancillary services that the clinic began providing in 2010 or 2011, and the lack of any increase in Kim's office hours.

The superior court issued findings of fact and conclusions of law in June 2018, determining that Angela had failed to prove that there had been any active appreciation of Kim's business. The court found that "Spyker's opinion carrie[d] more weight" than Rulien's and stated that it "had difficulty understanding the net assets method for purposes of determining active appreciation because this method did not attribute any value to [Kim's business] on the date of marriage or at the time Kim opened his medical clinic." The court also noted that Rulien's valuation included "land and

property that was clearly acquired as an investment and is not part of Kim's active practice of medicine."

After concluding that Kim's medical practice was not marital, the court divided the estate. It awarded 52% of the marital estate to Angela and directed Kim to pay Angela an equalization payment of $35,000 within 60 days. Finally, "[b]ecause Angela [was] awarded a substantial amount of marital assets," the court did not award her attorney's fees or costs for her expert.[5]

Angela appeals the superior court's conclusion that Kim's medical practice did not transmute into marital property and that the practice did not actively appreciate during marriage. She also argues that the superior court should have required Kim to pay her attorney's fees and litigation costs.

## III. STANDARDS OF REVIEW

"[T]he characterization of property as separate or marital may involve both legal and factual questions."[6] "Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions."[7] "Whether a spouse intended to donate his or her separate property to the marital estate is a factual finding . . . ."[8]

"Findings of fact are reviewed for clear error, but whether the trial court applied the correct legal rule in exercising its discretion is a question of law that we

_____

[5]     The court also did not credit Kim for interim spousal support and attorney's fees he previously paid.

[6]     *Brennan v. Brennan*, 425 P.3d 99, 104-05 (Alaska 2018) (alteration in original) (quoting *Beals v. Beals*, 303 P.3d 453, 459 (Alaska 2013)).

[7]     *Beals*, 303 P.3d at 459.

[8]     *Kessler v. Kessler*, 411 P.3d 616, 621 (Alaska 2018).

review de novo using our independent judgment."[9]  "A factual finding is clearly erroneous when, after reviewing the entire record, we are 'left with a definite and firm conviction that the trial court has made a mistake.' "[10]

"The superior court has broad discretion to award costs and fees in a divorce action. . . . We will reverse the superior court's decisions on these matters only if they amount to an abuse of discretion."[11]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Determining That The Corporation Was The Property At Issue.

Angela impliedly argues that the property at issue is Kim's clinic and his practice based in it.  She asserts that because his clinical practice did not exist until after they married, it is marital property by definition.  She points to the fact that Kim did not obtain a business license until after their marriage.  And she argues that Kim's clinical practice could only have increased in value during marriage because it did not exist before then.  She concludes, therefore, that it actively appreciated during their marriage.

Rulien's testimony was premised on the same characterization of Kim's practice.  For example, Rulien explained that he only looked at the business's financial records from 2011 through 2016 because Kim opened his clinical practice in 2011.  And he attributed his failure to value the business on the date of marriage to his understanding that the business began only in 2011.

---

**9**      *Brennan*, 425 P.3d at 105 (quoting *Beals*, 303 P.3d at 459).

**10**      *Kessler*, 411 P.3d at 621 (quoting *Abood v. Abood*, 119 P.3d 980, 984 (Alaska 2005)).

**11**      *Horning v. Horning*, 389 P.3d 61, 65 (Alaska 2017).

Kim, on the other hand, characterizes the property at issue as the corporation itself. He testified and presented evidence that he created the corporation in 2001. His corporation existed before he married Angela; he asserts that his decision to change its business model in 2011 does not mean that the business did not exist prior to marriage. He states that he listed Angela as a corporate officer out of "administrative convenience" and that the nature of his business precludes Angela from owning any shares or holding any officer position in the corporation. And he contends that Rulien's active appreciation analysis is fundamentally flawed because it did not value the corporation in 2009.

We must first determine whether the trial court erred when it accepted Kim's characterization of the property. Property law generally concerns legally enforceable rights, privileges, powers, and immunities with respect to valuable objects.[12] A property interest is the particular aggregation of rights, privileges, powers, and immunities that a person possesses with respect to an object enforceable against others.[13] Corporate property interests generally attach through ownership of stock or by virtue of one's position on the board of directors or as a corporate officer.[14]

Determining whether Kim's business is separate or marital property requires us to look at the various property interests involved in his professional corporation and their value. The Alaska Corporations Code[15] describes the rights and

---

[12]     1 POWELL ON REAL PROPERTY § 2.02 (Michael Allan Wolf ed., 2002).

[13]     RESTATEMENT (FIRST) OF PROPERTY § 5 (AM. LAW INST. 1936).

[14]     *See generally* 1 POWELL ON REAL PROPERTY § 2.09 (distinguishing "active" property interests associated with power to actively manage the corporation from "passive" interests associated with stock ownership).

[15]     AS 10.06.005-.995.

powers of directors, officers, and shareholders only with respect to a corporation as a whole.[16] A corporation's articles or bylaws may alter some of these rights and powers.[17] But the articles for Kim's professional corporation do not do so. Thus, there is no separate property interest that exists with respect to the clinic itself. Any interest in real property that the clinic occupies would belong to the corporation. The various rights and powers with respect to control of the clinic or any real property used by the clinic can only be exercised by shareholders, board members, or officers of Kim's professional corporation. And because it is a professional *medical* corporation, there are statutory limits on who can serve as a director, officer, or shareholder.[18] It is therefore not possible to separate Kim's clinical medical practice from the rest of his professional corporation. The property in dispute is thus Kim's professional corporation and not the medical clinic.

---

[16] *See, e.g.*, AS 10.06.450(a) (stating that unless provided otherwise in Corporations Code, "[a]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of a corporation shall be managed under the direction of, a board of directors"); AS 10.06.483(c) (granting corporation's officers authority and duty to manage corporation as provided in articles of incorporation, in corporate bylaws, and by board of directors); AS 10.06.453(e) (giving shareholders right to elect corporate directors at annual shareholder meeting). The Corporations Code applies to professional corporations except where there is a conflict with the Professional Corporation Act. AS 10.45.240.

[17] *See, e.g.*, AS 10.06.450(a) (permitting directors to delegate some or all of their powers as provided by articles of incorporation); AS 10.06.483(b) (giving board of directors power to choose corporate officers, unless otherwise dictated by articles of incorporation or bylaws); AS 10.06.420(a) (entitling each outstanding share to one vote on each matter submitted at shareholder meeting, except as otherwise indicated in articles of incorporation).

[18] AS 10.45.050-.060.

The superior court correctly focused on whether Kim's professional corporation transmuted or actively appreciated during his marriage to Angela.[19]

**B.     The Superior Court Did Not Err When It Concluded That Kim's Interest In His Professional Corporation Did Not Transmute Into Marital Property**.

When equitably dividing property between divorcing spouses, "the court first distinguishes between separate property and marital property."[20] "This classification process is important because only marital property is subject to division upon divorce."[21]

We have recognized that separate property may transmute into marital property "when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent."[22] In *Kessler v. Kessler* we clarified that the relevant intent is "the intent of the owning spouse that his or her separate property be treated as marital property for the purpose of dividing property in the event of a divorce."[23]

Angela's argument that Kim's business did not exist prior to their marriage and should have been classified as marital property is not an argument for transmutation. Rather it is an argument that the superior court misclassified the property in the first

---

[19]     Although Angela argues the 2011 business license shows that the business did not exist before then, the license was obtained by Kim's corporation. And the transmutation and active appreciation inquiries require us to look at property interests that belonged to Kim, not the corporation. *Cf. Lacher v. Lacher*, 993 P.2d 413, 422 (Alaska 1999) (holding that property interest held by third-party was not subject to equitable division). The business license is therefore irrelevant to this analysis.

[20]     *Kessler v. Kessler*, 411 P.3d 616, 618 (Alaska 2018).

[21]     *Id.*

[22]     *Id.* at 618-19.

[23]     *Id.* at 619 (emphasis omitted).

instance. But because Kim's business did exist prior to marriage, under a different operational model, the court did not err by concluding that it was his separate property when they married.

In support of her position that Kim's separate business transmuted during marriage, Angela marshals four pieces of evidence that she argues demonstrate Kim's intent to donate his business to the marital estate: (1) her contribution of $15,000 to help Kim pay off his credit card debts so he could obtain a business loan; (2) her presence at various business meetings; (3) her stated belief that she and Kim intended the business to be marital; and (4) Kim's procurement of a business license in 2011.

We dispense with the last piece of evidence first. That Kim obtained a business license in 2011 is not evidence that he intended to donate his business to the marital estate. This remains an argument that the business did not exist prior to 2011. But because it did, obtaining a business license is not relevant to Kim's intent to donate the business to the marriage.

Turning to Angela's other pieces of evidence, the superior court found that Angela had failed to show that her $15,000 donation to the marital estate was to help Kim establish an independent clinical practice. Angela did present evidence demonstrating that she transferred $15,000 to a bank account opened in both her and Kim's names, but her only support for her claim that the money was to help Kim open his clinic was her own testimony. And Kim testified that this money was used to help with their personal land purchases. Evidence in the record supports the superior court's finding, and it was not clear error for the court to find that Angela failed to prove that the $15,000 went toward the establishment of Kim's clinic.

In support of her claim that Kim intended the business to be marital, Angela testified that she was listed as secretary and treasurer for the corporation. She provided copies of minutes from various meetings to support her testimony. But on cross

examination she admitted that she signed the meeting minutes only when Kim directed her to do so and that she never drafted the minutes herself as a corporate secretary would typically do. Kim testified that he listed Angela as a corporate officer only so he could deduct the dinner from his taxes. The court found Kim's explanation credible, and we accord great deference to findings based largely on oral testimony.[24] The evidence supports the court's finding that Angela was an officer of the corporation in name only, and that Kim's listing her in minutes was not an indication that he intended to donate the corporation to the marital estate.

Finally, Angela's belief that she and Kim intended the business to be marital was contradicted by Kim's testimony. As we concluded in *Kessler*, one spouse's "unexplained and unilateral belief is not evidence of [the owning spouse]'s donative intent."[25]

The superior court did not clearly err by finding that Kim did not intend to donate the corporation to the marital estate, and it was not error to conclude that Kim's business did not transmute during the marriage.

C. **The Superior Court Did Not Clearly Err By Finding The Business Did Not Actively Appreciate.**

"Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage."[26] "[A]ctive appreciation recognizes that a separate asset can become partly marital by growing in

---

[24] *See Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979) ("Deference to the findings of the superior court is particularly appropriate when . . . the bulk of the evidence at trial is oral testimony.").

[25] 411 P.3d at 621.

[26] *Harrower v. Harrower*, 71 P.3d 854, 857-58 (Alaska 2003).

-13- 7484

value during the course of a marriage."[27]  To conclude that separate property actively appreciated a court must make three findings:  "First, it must find that the separate property in question appreciated during the marriage.  Second, it must find that the parties made marital contributions to the property.  Finally, the court must find a causal connection between the marital contributions and at least part of the appreciation."[28]  The moving spouse has the burden of proof with respect to the first two elements.[29]  The burden then shifts to the non-moving spouse to show an absence of a causal connection between active marital efforts and appreciation of the property.[30]

The superior court found that Angela had failed to show any increase in the business's value during marriage and that Angela therefore failed to carry her burden of showing that there had been appreciation.  Angela asserts that because the clinic did not exist prior to the marriage, any value attributed to the business could only be considered an increase.  And she compares Kim to a mechanic who initially worked for someone else but later opened his own shop.

We have already concluded that Kim's business did exist before he and Angela married.  Angela's analogy to a mechanic oversimplifies the nature of Kim's business.  When they married, Kim worked as an independent contractor.  The clinics where he worked paid his business, not Kim personally.  While the clinics covered most of the overhead of running the medical practice, Kim was responsible for his own medical malpractice insurance and other expenses.

---

[27]     *Id.* at 858.

[28]     *Id.* (quoting BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 236 (2d ed. 1994)).

[29]     *Hanson v. Hanson*, 125 P.3d 299, 304 (Alaska 2005).

[30]     *Id.*

Angela's expert, Rulien, supported her position, and valued Kim's business at zero when they married. But the superior court discounted Rulien's opinion and relied instead on Kim's expert's testimony. Because "it is not our role to weigh the evidence anew, but rather to determine whether the trial court's findings are supported by the record,"[31] we will not overrule the weight that the superior court gave to this conflicting testimony.

Our review of this matter is shaped by the way the parties tried the case in the superior court and by the appeal's framing. We note that annual income actually received by a spouse from a tax-paying entity in the form of salary and other benefits or disbursements, or received in the form of a pass-through entity's taxable income, would be a marital asset each year the parties were married.[32] Questions sometimes arise about whether the amount and use of that marital asset are appropriate. For example, an entity's owner may have artificially lowered salary or taxable income or failed to take a distribution of taxable income, and used the saved or retained cash to purchase business assets in either the normal course or as investment assets for the entity. The entity owner's spouse might then be able to demonstrate that these new assets were traceable to a marital asset so that the new assets are marital.[33] Or the spouse might demonstrate that these new assets independently showed marital-based active appreciation of the

---

[31]     *Keturi v. Keturi*, 84 P.3d 408, 412 (Alaska 2004).

[32]     *See Schmitz v. Schmitz*, 88 P.3d 1116, 1124 (Alaska 2004) ("[S]alaries earned by either spouse during marriage . . . are considered marital assets"); *Lacher v. Lacher*, 993 P.2d 413, 422 (Alaska 1999) (noting that property purchased with joint funds is marital property).

[33]     *See generally Pasley v. Pasley*, 442 P.3d 738, 745-47 (Alaska 2019) (discussing tracing rules and relevant evidence).

corporation.[34] But those arguments were not raised in this case. The superior court did not clearly err when it found that Kim's business did not actively appreciate.

**D.** **The Superior Court Did Not Abuse Its Discretion By Declining To Award Angela Attorney's Fees and Litigation Costs**.

"The superior court has broad discretion to award costs and fees in a divorce action."[35] Such an award is intended "to ensure that 'both spouses have the proper means to litigate the divorce action on a fairly equal plane.' "[36] The superior court focuses on "the parties' relative economic situations and earning capacities" to decide whether to make such an award.[37] "A party's economic situation includes the divorce property division, and a party who receives a property settlement sufficient to cover incurred attorney's fees should expect to pay his or her own fees."[38]

When the superior court awarded Angela 52% of the marital estate, valued at over $600,000, it ordered Kim to make an equalization payment of $35,000 within 60 days of its final order. The court based its unequal division of the estate on the disparity between Angela's and Kim's income and because the marital assets awarded to Angela would be harder to liquidate. When it denied Angela's request for attorney's fees and

---

[34]    *See Schmitz*, 88 P.3d at 1125 (discussing marital contributions to separately-owned corporation and application of active appreciation rule).

[35]    *Horning v. Horning*, 389 P.3d 61, 65 (Alaska 2017).

[36]    *Stevens v. Stevens*, 265 P.3d 279, 290 (Alaska 2011) (quoting *Fernau v. Rowdon*, 42 P.3d 1047, 1059-60 (Alaska 2002)).

[37]    *Id.*

[38]    *Id.*

costs, the court noted the "substantial amount of marital assets" it had awarded her. The superior court did not abuse its discretion.[39]

## V.    CONCLUSION

We AFFIRM the superior court's decision that Kim's medical practice neither transmuted nor actively appreciated during the marriage, and therefore remained his separate property. We also AFFIRM the court's decision not to award attorney's fees and litigation costs.

---

[39]    Angela argues that Kim never paid her the required $35,000 equalization payment. If so, an action to enforce the court's order remains available to Angela in superior court.