NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TAMERRA L. DEMENNO, | ) | |
| | ) | Supreme Court No. S-18142/18301 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3AN-17-09163 CI |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT[*] |
| DAVID L. DEMENNO, | ) | |
| | ) | No. 2015 – February 28, 2024 |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Kara A. Nyquist, Nyquist Law Group, Anchorage, for Appellant and Cross-Appellee. Roberta C. Erwin, Palmier ~ Erwin, LLC, Anchorage, for Appellee and Cross-Appellant.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

Divorcing spouses each appeal aspects of the superior court's order dividing their property. Many of their arguments relate to a business founded by the

---

[*] Entered under Alaska Appellate Rule 214.

husband prior to the parties' marriage. On appeal the wife challenges the court's determination that the business did not transmute into marital property, the court's valuation of the business's active appreciation due to marital efforts, and the court's final award of attorney's fees. On cross-appeal the husband challenges the court's active appreciation valuation of real property he rented to the business. Observing no prejudicial error or abuse of discretion, we affirm the court's property division order in all respects.

## II.  FACTS AND PROCEEDINGS

### A.  Family History

David and Tamerra DeMenno met in the late 1980s and married in January 2003.[1] David founded a business, Alaska Land Clearing Contractors, LLC (ALC), in 1998. In February 2002 Tamerra went to work for David at ALC. Tamerra worked in the office on managerial tasks such as payroll, bookkeeping, hiring, invoicing, and marketing. According to Tamerra, David managed the "outside" aspects of the business while she managed the "inside."

In 2002, shortly before the parties' marriage, David purchased a property on East 56th Avenue, which he rented to ALC and used as its primary headquarters. When it was purchased, the East 56th Avenue property contained only a shipping container, a dilapidated shed, and an outhouse. In 2011 and 2012, the parties made significant renovations.

In 2008 the parties formed Alaska Clearing and Grinding. Tamerra was listed as the sole owner so she and David could bid for contracts available to minority- and female-owned businesses. The business had a few successful years, and ceased operations in 2013. Afterwards, ALC paid the equipment loans through 2017 and kept the equipment owned by Alaska Clearing and Grinding.

---

[1] The couple has two children. There was a separate custody trial, and neither party appeals the custody order.

During the marriage, income from ALC supported the parties' lifestyle. Their combined income was routinely over $600,000, comprised of Tamerra's salary from ALC and David's extensive owner's draws from the company.

## B.     Proceedings

The parties separated on September 15, 2017, the day on which Tamerra filed for divorce. The resulting litigation has lasted more than 4 years and involved 77 motions and over 20 evidentiary hearings.

### 1.     Initial proceedings, interim disbursement, and discovery disputes

The superior court convened two hearings regarding the parties' interim finances in April 2018. The court ordered that Tamerra receive an initial distribution from the marital estate of $400,000 to "level the playing field" because David could pay for his litigation expenses through ALC. The court also granted Tamerra $10,000 per month in interim spousal support. The court did not grant Tamerra's request for additional attorney's fees given its grant of the $400,000 disbursement.

Pretrial discovery between the parties was "convoluted" and contentious. The parties' disputes largely centered on obtaining business information for ALC and for TTZ Investments, LLC, an investment company that Tamerra operated with marital funds. The court ultimately granted discovery motions brought by each of the parties, granted David attorney's fees associated with one motion, and awarded Tamerra attorney's fees associated with two such motions.

### 2.     Transmutation trial

The court convened an initial trial on property issues in December 2019.

#### a.     Parties' testimony

Tamerra testified about her role at ALC and David's promises to make her an owner. She claimed that David promised when they first met that the two would be equal partners and build ALC together. When that did not occur, and when David reportedly became "possessive" and threatening toward her, she filed for divorce four

times. But she said that David would then "starve" her back into the marriage, promising to name her on the titles, bank accounts, credit cards, and as an owner or co-owner of ALC if she would reconcile with him. She also testified that she was held out to the public as a co-owner and executive officer of ALC, as demonstrated by several advertisements and trade journals. On cross-examination Tamerra acknowledged that she had previously signed an affidavit confirming that David repeatedly told her and the employees of ALC that she was not an owner.

Tamerra credited herself with setting up a business office and creating materials that led to some of the larger contracts ALC received. She also testified that her efforts led to the improvements and new buildings on the East 56th Avenue property. Tamerra was paid about $2,000 per week for her efforts in the office, totaling about $104,000 per year.[2]

David testified that he had built ALC into a very successful company before he married Tamerra and that he never intended to make her a partner or co-owner. He explained that he and Tamerra "had negotiations due to five divorces," but he never agreed to make her an owner of ALC. In support of his testimony, David admitted emails from the parties' 2014 divorce litigation stating that he never intended to make Tamerra a co-owner as a part of a reconciliation agreement, and would rather work out the parties' issues in couple's counseling than through a contract. David admitted to offering to make Tamerra an owner in 2017 so she would cease the current divorce action, but she persisted with it. He also indicated that he would say things he did not mean during the divorce proceedings because he feared losing contact with his children if the parties divorced.

---

[2] David testified that Tamerra paid herself $130,000 to $200,000 per year in 2011-2014 when she controlled the payroll direct deposit system, but her salary was technically $104,000 per year.

David further claimed that he did not want to make Tamerra an owner of ALC because she had a history of using his credit to its limit, taking money out of the companies, paying herself a double salary, and shutting down business contracts when the parties were fighting. David submitted the company's biannual reports to the State of Alaska, none of which listed Tamerra as an owner.

### b. Property valuation expert witnesses

Tamerra's real property valuation expert Steve MacSwain testified regarding the value of the East 56th Avenue property. The parties stipulated to the admissibility of MacSwain's report and to the property's ultimate valuation: $1,150,000. MacSwain testified about the improvements that were made to the property during the couple's marriage, including a renovation in 2011 or 2012. The report also notes increasing development in the area which may have led to increased property values.

An ALC appraiser testified about two different valuations of the company's equipment. The first valuation, from June 2017, valued the equipment at $5.3 million based on a "fair market valuation" (what each piece of equipment could be sold for individually). The second valuation was conducted in January 2019, utilized an "orderly liquidation" price (what the equipment could be resold for on an accelerated timeline), and reflected an additional 18 months of depreciation. The 2019 equipment valuation reflected a value of $3.5 million.

### 3. The superior court's transmutation order

The superior court ruled in March 2020 that ALC had not transmuted because David never intended to donate the business to the marital estate. The court assessed the parties' respective credibility and essentially found that neither party was entirely credible. Regarding ALC specifically, the court found that Tamerra "very much wanted [David] to make her an owner," but it recognized that her intentions and desires were not dispositive.

Relying on our decisions in *Kessler v. Kessler*[3] and *Brennan v. Brennan*,[4] the superior court focused on whether David intended to donate ALC to the marriage. Although David made multiple representations over time related to ownership of the business, the superior court found credible David's testimony that this was part of his negotiation strategy to get Tamerra back after they fought or she filed for divorce, and that he never actually intended to make her an owner. The court concluded that ALC had not transmuted to the marital estate because David never intended that to happen.

Tamerra moved for reconsideration of the order on transmutation, arguing that the court failed to consider whether ALC had been transmuted by operation of contract. The superior court denied the motion. The court reasoned that a contract analysis would focus on mutual assent to be bound, which would "misdirect" the transmutation analysis away from the owning spouse's intent.

### 4. Interim attorney's fee order

In October 2020, the court granted Tamerra's request for interim attorney's fees because of the length of the litigation and David's distinct financial advantage. The court granted Tamerra expert witness fees and $20,000 per month for legal fees for October, November, and December 2020.

### 5. Second property division trial

In November 2020 the court reconvened for trial regarding property valuation and division. Relevant to this appeal, both parties presented expert witnesses on the valuation and active appreciation of ALC.[5] Tamerra called Jacquelyn Briskey, and David called Susan Spyker.

---

[3]    411 P.3d 616, 619 (Alaska 2018).

[4]    425 P.3d 99, 106-07 (Alaska 2018).

[5]    "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage." *Layton v. O'Dea*, 515 P.3d 92, 106 (Alaska 2022) (quoting *Aubert v. Wilson*, 483 P.3d 179, 188 (Alaska 2021)).

### a. Briskey's 2017 valuation and active appreciation analysis

Tamerra's expert, Jacquelyn Briskey, is a certified public accountant who provides litigation support, among other services. Briskey testified that this was her first active appreciation analysis, but that she had valued many similar construction companies previously. Briskey calculated the value of ALC using two methods: the capitalization of earnings method (based on the company's adjusted earnings) and the adjusted book value (largely based on fair market values of the company's assets).

Under the capitalization of earnings method, Briskey used December 31, 2017, as the valuation date for ALC because this was more accurate than a mid-year valuation and was "pretty close" to the date of separation. Briskey therefore used income data from ALC for years 2013-2017. Briskey also stated that although the parties had significant draws and salaries from the business, they also returned significant income to the business, such that all business income should be considered marital. Briskey included Alaska Clearing and Grinding's net income in 2013 in her total cash flow for ALC that year based on her conclusion that the businesses were commingled.

In analyzing the adjusted book value of ALC, Briskey included the 2017 valuation of the business's equipment instead of the 2019 valuation because she concluded it better reflected the value of the equipment at the time of separation. Briskey ultimately calculated the 2017 value of ALC as $2,732,400 based on the capitalization of earnings method and as $4,397,300 based on the adjusted book value. Briskey testified that she chose the adjusted book value as her valuation in 2017 because it more accurately represented the true value of the business, encompassing the value of its equipment and property.

Briskey used David's expert's valuation report for 2003 to calculate active appreciation, even though it utilized a different valuation method than her 2017 valuation, because it was the only valuation available for that time period. Briskey

testified that using the two valuations accomplished through different methods was fine because both represented the "fair market value" of the company. Accounting for inflation as the only relevant aspect of passive appreciation, she calculated the net marital active appreciation to be $3,339,122.

### b. Spyker's 2003 and 2017 valuations of ALC and active appreciation analysis

David's expert on business valuation, Susan Spyker, testified that she is a certified public accountant and valuation analyst and has conducted at least 20 active appreciation analyses since 2006. Spyker conducted the only valuation of ALC in 2003. The lack of a retrospective equipment appraisal meant that she could not evaluate the company's 2003 adjusted book value. Based on the 2002 net cash flow, Spyker used the capitalization of earnings method to calculate the 2003 value of ALC as $446,800.

Spyker also valued ALC at separation, using both the adjusted book value and the capitalization of earnings methods. For the capitalization of earnings method, Spyker used the date of separation, September 2017, to value the business. To account for income variation throughout the year and tax adjustments, she used end-of-year data from 2012 through 2016. She also included an adjustment for reasonable compensation from the business. In Spyker's opinion, most of the profit generated by the business had not gone back into the business, but had gone directly to benefit the marriage. Spyker testified that she did not include any Alaska Clearing and Grinding income because it was a separate legal entity, but included the value of the company's equipment when it was transferred to ALC.

In her adjusted book valuation, Spyker used the 2019 appraisal of the equipment owned by the company because the 2017 report listed particular pieces of equipment at a sale price higher than their purchase price.

Overall, Spyker calculated the 2017 value of ALC at $1,460,000 based on the capitalization of earnings method and at $1,400,900 based on the adjusted book value. In calculating active appreciation Spyker opted for the capitalization of earnings

method because it is more typically used in divorces and because the 2003 valuation used this method. Finally, Spyker considered much of the appreciation of the business to be passive, pointing to the customer relationships that existed on the date of marriage, federal funding increases, equipment purchases, new technology, and a greater number of employees. Therefore, she found that 40% of the appreciation in value was active and calculated the marital portion of the increase in value as $337,040.

### 6. The final property division order

The superior court issued a final property division order in June 2021. The court divided the marital estate 55/45 in Tamerra's favor, valued the entire estate at approximately $2.5 million, and ordered a $664,591 equalization payment from David to Tamerra to accomplish the 55/45 division. Three of the court's findings in this order are before us on appeal.

### a. ALC active appreciation

The court found all three elements of active appreciation were satisfied:[6] first, ALC had increased in value during the marriage; second, "both parties contributed significantly to the business over the course of the marriage"; and third, there was "little doubt that the marital contributions of time and effort directly led to the overall success" and growth of the business.

The court relied on Spyker's report in its analysis. It found Spyker's report and testimony more persuasive due in part to Spyker's greater experience. The court also characterized Spyker's use of the separation date as more accurate and recognized that Spyker used the same method of analysis for both the 2003 and 2017 valuations of the business. The court agreed with Spyker that very little marital income was put back into the business. But the court criticized Spyker's reliance on the 2019 equipment valuation rather than the 2017 equipment valuation because it resulted in an undervaluation of ALC.

---

[6] *See Thiele v. Thiele*, 473 P.3d 327, 335 (Alaska 2020).

The court modified Spyker's final determination of the value of the active appreciation. It found that all appreciation in value was active except for that attributable to inflation. The court utilized Spyker's 2017 valuation of ALC. Correcting the 2003 valuation for inflation, the court valued the active appreciation of ALC due to marital efforts at $842,600.

### b.     East 56th Avenue active appreciation

The court first found that the property was David's separate property because David purchased it before the parties were married and never intended to donate it to the marriage. Second, the court found that the property had actively appreciated during the parties' marriage, and used MacSwain's valuation to calculate that appreciation. The court credited Tamerra's testimony, corroborated by MacSwain, that the parties had made many renovations. The court declined to reduce the value of the appreciation beyond inflation because David failed to meet his burden to demonstrate an absence of a causal link between marital efforts and active appreciation. The court valued the active appreciation of the property due to marital efforts at $686,036.30.

### c.     Attorney's fees

The court noted that Tamerra had used her initial distribution of $400,000 to fund her "lavish lifestyle," instead of "fund[ing] her legal team." The court found it was clear that Tamerra was required to incur substantial legal fees in order to value the business, but that Tamerra was partially to blame for the fees because she spent a large amount "chasing information that wasn't ultimately utilized."

The court balanced these considerations against David's distinct financial advantage. In light of the previous amounts Tamerra had received, the court awarded her an additional $100,000 in attorney's fees.

### 7.     This appeal

Tamerra challenges the court's determination that ALC did not transmute into marital property, the court's reliance on Spyker's expert report in determining the

active appreciation of ALC, and the award of attorney's fees. On cross-appeal David challenges the court's active appreciation analysis of the East 56th Avenue property.

## III.    STANDARD OF REVIEW

The equitable division of marital assets involves three steps:  "(1) determining the specific property available for distribution; (2) valuing the available property; and (3) equitably dividing property available for distribution."[7]  This appeal concerns the first two steps of this process.

As to the first step, "the characterization of property as separate or marital may involve both legal and factual questions."[8]  Findings regarding the "parties' intent, actions, and contributions" are factual questions.[9]  Whether the trial court applied the correct legal rule is a question of law that we review using our independent judgment.[10]  We review "questions of contract formation and interpretation de novo."[11]  But we review any factual findings relevant to contract formation for clear error.[12]

"The second step, the valuation of property, is a factual determination."[13]  "We review factual findings for clear error, which exists 'only when we are left with a

---

[7]    *Brennan v. Brennan*, 425 P.3d 99, 105 (Alaska 2018) (citing *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

[8]    *Id.* at 104.

[9]    *Id.* at 104-05 (quoting *Beals*, 303 P.3d at 459).

[10]    *Id.* at 104.

[11]    *Bingman v. City of Dillingham*, 376 P.3d 1245, 1247 (Alaska 2016) (quoting *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1014 (Alaska 2011)).

[12]    *Id.* (citing *Chilkoot Lumber Co.*, 255 P.3d at 1014).

[13]    *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019) (quoting *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017)).

definite and firm conviction based on the entire record that a mistake has been made.' "[14]

"The superior court has broad discretion in awarding attorney's fees in a divorce action."[15] We review attorney's fee awards for abuse of discretion, which occurs when a fee award "is arbitrary, capricious, or manifestly unreasonable."[16]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Determining That ALC Did Not Transmute Into Marital Property.

Tamerra first argues the court erred when it found that David did not intend to make a gift of ALC to the marriage, contending that the court failed to adequately examine the entirety of the relevant evidence. Additionally, Tamerra argues the superior court erred when it did not consider whether the business transmuted through contract or other means.

#### 1. The superior court's finding that David never intended to donate ALC to the marriage is not clearly erroneous.

Typically, a spouse's individual property obtained prior to marriage remains that spouse's separate property.[17] But separate property becomes marital through transmutation if "one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent."[18] Our decision in *Kessler v. Kessler* emphasizes that a determination whether property has transmuted by gift or donation to the marriage must focus upon whether the owning spouse intended to make

---

[14] *Id.*(quoting *Hockema*, 403 P.3d at 1088).

[15] *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (citing *Hopper v. Hopper*, 171 P.3d 124, 129 (Alaska 2007)).

[16] *Id.* (quoting *Ferguson v. Ferguson*, 195 P.3d 127, 130 (Alaska 2008)).

[17] *Kessler v. Kessler*, 411 P.3d 616, 618 (Alaska 2018).

[18] *Id.* at 619 (citing *Sparks v. Sparks*, 233 P.3d 1091, 1094, 1096 (Alaska 2010)).

a gift.[19]  Sharing property during a marriage is not dispositive because there must be an intent to donate, convey, or gift the property to the marital estate.[20]

Since *Kessler*, we have decided several cases involving transmutation, including two that considered whether a separate business had transmuted by donation to the marriage.[21]  In those cases, the decisive factor was whether the evidence sufficiently demonstrated the owning spouse's donative intent.[22]  This was despite evidence that the non-owning spouse worked extensively for the business[23] or believed it was marital.[24]

Here, the superior court made express findings about David's credibility and intent, ultimately finding that Tamerra did not prove David ever intended to gift ALC to the marriage.  The court first assessed the parties' credibility, explaining that both were "credibility challenged."  In evaluating the evidence, including the parties' testimony, the court found David "always considered himself as the sole owner of ALC" and that David never actually intended to make Tamerra an owner.

---

**19**      *Id.*

**20**      *Id.*

**21**      *See Aubert v. Wilson*, 483 P.3d 179, 188-89 (Alaska 2021); *Brennan v. Brennan*, 425 P.3d 99, 106-07 (Alaska 2018); *Hall v. Hall*, 426 P.3d 1006, 1009-10 (Alaska 2018); *Pasley v. Pasley*, 442 P.3d 738, 750-51 (Alaska 2019); *Thiele v. Thiele*, 473 P.3d 327, 330, 334-35 (Alaska 2020).

**22**      *See, e.g.*, *Thiele*, 473 P.3d at 330, 334-35 (holding wife's belief that business was marital and her occasional appearance as corporate officer on certain documents for tax deductions insufficient to overcome husband's stated intent to remain sole owner); *Brennan*, 425 P.3d at 107-08 (holding wife's work as accountant and onshore liaison for husband's fishing business was insufficient to demonstrate that husband had requisite intent to transmute business to marriage).

**23**      *Brennan*, 425 P.3d at 107.

**24**      *Thiele*, 473 P.3d at 330.

Tamerra argues that this finding is contradictory: if David is not credible, then the court could not have relied on his statements about his intent. But it is clear that the court carefully evaluated David's testimony about his intent, and specifically found his testimony on this point to be credible. While we have cautioned trial courts against relying on self-serving testimony,[25] we also accord deference to trial courts' credibility determinations.[26] David's testimony regarding his intent and negotiating tactics over the years supports the court's ultimate conclusion that he never intended to make Tamerra an owner of ALC. To the extent that Tamerra argues that the court failed to consider evidence that the business transmuted through gift or donation, we reject those arguments. Having reviewed the record, we affirm the court's finding that David did not intend to donate ALC to the marriage and its determination that ALC therefore did not transmute by gift or donation.

### 2. The superior court's well-supported factual findings demonstrate the lack of a contract to transfer the business to the marriage.

Tamerra also challenges the superior court's order on reconsideration that ALC did not transmute through contract, arguing that the court erred in ruling that property could not be transmuted by contract and that the evidence here supports a finding that ALC transmuted in that way.[27] We agree that it was error to hold that

---

[25]   *Layton v. O'Dea*, 515 P.3d 92, 105 (Alaska 2022).

[26]   *Thompson v. Thompson*, 454 P.3d 981, 991 (Alaska 2019) ("Trial courts . . . bear the primary responsibility for 'judging the credibility of witnesses and weighing conflicting evidence.' " (quoting *Berry v. Berry*, 277 P.3d 771, 778 (Alaska 2012))).

[27]   David argues that Tamerra waived her arguments about whether the parties formed a contract when she failed to raise them at trial. Here, however, where David had the opportunity to substantively respond to the motion for reconsideration, and where the court addressed the merits of the issue in its subsequent order, we do not consider the issue waived. *See McDaniels v. State*, 451 P.3d 403, 406 (Alaska App.

transmutation cannot occur by contract. But we affirm the court's ultimate determination because its factual findings, which are well supported by the record, demonstrate that there was no contract between the parties by which ALC would have transmuted.

As an initial matter, it was error for the superior court to hold that property cannot be transmuted by contract. Under our case law, "agreements[,] oral or written, may demonstrate the owner's intent, or lack of intent, to convert separate property to marital property."[28] Our decision in *Kessler* did not limit the ways in which property can be transmuted, and specifically noted that donation is only "one way" property may be transmuted.[29] Subsequently, in *Layton v. O'Dea*, we explicitly clarified that property can transmute through contract.[30] Our decision in *Layton* explains that the contract analysis is different from the gift analysis, in that a contract analysis examines whether the evidence demonstrates an objective manifestation of intent to form a contract, notwithstanding any secret, "subjective contrary intentions" of the parties.[31]

But we ultimately affirm the superior court's decision that ALC was not transmuted because, based on the record before us, the parties formed no contract under which ALC would transmute into marital property. Tamerra points to two instances that she argues demonstrate a contract by which ALC was transmuted. First, Tamerra

---

2019) (holding that issue resolved by trial court order can be considered by appellate court).

[28]     *Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992); *see also Young v. Kelly*, 334 P.3d 153, 157 (Alaska 2014).

[29]     *Kessler v. Kessler*, 411 P.3d 616, 619 (Alaska 2018).

[30]     515 P.3d at 105 ("The classification of property can be changed . . . 'by an express or implied contract . . . or other transaction between the spouses during the marriage.' " (quoting 1 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5:66 (4th ed. 2023))).

[31]     *See id.* at 105 n.42.

claims that an offer and acceptance occurred via email when David promised he would make her a co-owner if she ceased a 2014 divorce action, which she then did. But as David points out, subsequent emails demonstrate that the parties were still negotiating terms at that time. Indeed, emails show David wanted to work out the couple's issues in therapy rather than through a contract. Tamerra also points to text messages sent in 2017, near the inception of the current divorce proceeding. In those messages, David offers to make Tamerra a co-owner of ALC if she reconciles with him. But as the parties did not reconcile, it follows that Tamerra did not actually accept David's offer in 2017.[32]

On this record, we agree with the superior court's characterization that the parties' marriage was "one long negotiation." The parties never reached the mutual assent to be bound or meeting of the minds required to form a contract.[33] We therefore affirm the court's ultimate conclusion that ALC did not transmute through contract.

### 3. Tamerra's alternate theories also fail.

Tamerra makes two alternative arguments: first, that the court should have found a quasi-contract under a theory of promissory estoppel, and second, that the superior court should have considered applying a constructive trust. Neither of these arguments is persuasive.[34]

In order for a theory of promissory estoppel to apply, the court must determine that enforcement of a promise inducing detrimental reliance is necessary in

---

[32] *Id.*

[33] *See Young*, 334 P.3d at 157.

[34] These issues were not timely raised before the superior court. Tamerra first raised these arguments in her motion for reconsideration, and the court did not address them. We therefore review for plain error, looking to whether denying these alternative theories was "an obvious mistake" creating "a high likelihood that injustice has resulted." *Morris v. Morris*, 506 P.3d 8, 14 (Alaska 2022) (quoting *D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001)).

the interest of justice.[35] Similarly, a constructive trust is "an equitable remedy" to be applied in situations where "a party holds a property interest 'by reason of unjust, unconscionable, or unlawful means.' "[36] But here, the superior court had multiple legal remedies at its disposal to assure that its property division accounted for marital efforts devoted to separate property, and it ultimately did address those marital efforts in its active appreciation analysis; therefore the court need not have reached or approved Tamerra's suggested equitable remedies.[37]

## B. The Superior Court Did Not Clearly Err In Valuing ALC's Active Appreciation.

Tamerra next challenges the superior court's valuation of ALC's active appreciation due to marital efforts, and particularly contends that the court should not have relied upon the analysis of David's expert. "Active appreciation occurs when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage. [A]ctive appreciation recognizes that a separate asset can become partly marital by growing in value during the course of a marriage."[38] The superior court must make three findings to support a determination of active appreciation: (1) separate property appreciated in value during the marriage; (2) there were marital contributions to the property; and (3) there is a "causal connection between the marital contributions and at least some part of the appreciation."[39] "The spouse seeking to

---

[35] *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1284 (Alaska 1985).

[36] *Gold Dust Mines, Inc. v. Little Squaw Gold Mining Co.*, 299 P.3d 148, 160 (Alaska 2012) (quoting *Riddell v. Edwards*, 76 P.3d 847, 852 (Alaska 2003)).

[37] *See Young v. Lowery*, 221 P.3d 1006, 1012-13 (Alaska 2009) (vacating constructive trust and remanding because of insufficient evidence and availability of other remedies), *abrogated on other grounds by Howell v. Howell*, 581 U.S. 214 (2017).

[38] *Thiele v. Thiele*, 473 P.3d 327, 335 (Alaska 2020) (alteration in original) (quoting *Harrower v. Harrower*, 71 P.3d 854, 857-58 (Alaska 2003)).

[39] *Layton v. O'Dea*, 515 P.3d 92, 106 (Alaska 2022) (quoting *Aubert v. Wilson*, 483 P.3d 179, 188-89 (Alaska 2021)).

classify the appreciation as active has the burden of proving the first two elements — an increase in value and marital contribution — while the burden of showing the absence of a causal link lies with the owning spouse."[40]

When a court determines the value of active appreciation, the court must account for passive appreciation, which "occurs without any significant contribution being made toward that increase by either spouse, (i.e. inflation or other economic factors beyond the spouse's control)."[41]  Additionally, parties often present conflicting expert reports on the valuation of businesses and it is not our role to "weigh the evidence anew, but rather to determine whether the trial court's findings are supported by the record."[42]

Here the superior court's well-supported reasoning for ultimately crediting aspects of David's expert's valuation is not clearly erroneous, especially in light of the deference we accord to the superior court's weighing of conflicting expert testimony.[43]  The court found Spyker's analysis generally more persuasive due to her greater experience and her use of the same method for valuing the company in 2003 and 2017.  The court's explanation for accepting various aspects of Spyker's analysis was reasonable and reflected careful consideration of the expert reports and testimony offered by each of the parties.

Moreover, the court corrected what it deemed to be a significant error in Spyker's valuation, disagreeing with her assessment that 60% of the appreciation of the company was due to passive factors.  The court found the parties' active efforts were

---

**40**      *Id.* (quoting *Aubert*, 483 P.3d at 189).

**41**      *Odom v. Odom*, 141 P.3d 324, 335 (Alaska 2006) (quoting *Brooks v. Brooks*, 733 P.2d 1044, 1054 & n.22 (Alaska 1987)).

**42**      *Thiele*, 473 P.3d at 335; *see also Hensel v. State*, 604 P.2d 222, 236 (Alaska 1979) (holding that conflict between "fairly evenly balanced" expert testimony is "for the superior court to resolve").

**43**      *See Hensel*, 604 P.2d at 236.

largely responsible for the company's appreciation in value.[44]  And the court corrected another error in Spyker's active appreciation analysis:  it converted the 2003 value of ALC to 2017 dollars to account for inflation.  This careful analysis demonstrates that the court thoroughly examined the evidence before it and sufficiently weighed conflicting expert testimony.

Tamerra challenges the court's finding that Spyker's analysis was more reliable, arguing that Briskey's reliance on different valuation methods for 2003 and 2017 was due in part to David's failure to provide Briskey with adequate information.  But, as noted in Spyker's valuation of ALC in 2003, it would not have been possible to provide Briskey with the information she would have needed to create an adjusted asset value for that time period, because there was not a list of equipment values from 2003.  The court's concern regarding the consistency of the valuation method used by the parties' experts was reasonable, and Tamerra has not persuasively argued otherwise.

Tamerra also criticizes Spyker's methodology because she used the 2019 valuation of ALC's equipment instead of the 2017 valuation.  The court noted that the use of the 2019 valuation report led to a lower valuation for all of ALC's equipment and thus likely undervalued ALC.  Tamerra argues that the court should have adjusted its valuation to reflect this, but it is not clear how the court could have done that accurately given difficulties in the 2017 values.  Overall, the court found discrepancies in both experts' analyses and recognized this potential undervaluation as one limitation in the report it found overall "more reliable."  We will not disturb this careful weighing on appeal.

Tamerra further complains that Spyker's report should have included and accounted for revenue from Alaska Clearing and Grinding.  But Spyker testified that she did not include Alaska Clearing and Grinding revenue because it was a legally

---

[44]  *See Odom*, 141 P.3d at 335 (quoting *Brooks*, 733 P.2d at 1054 & n.22).

separate entity. Additionally, ALC was paying the Alaska Clearing and Grinding equipment loans, so Spyker did not think any added value would be substantial. Finally, Spyker testified that Alaska Clearing and Grinding ceased operating in 2013 and her valuation method only looked at net cash flow from 2012 through 2016, so higher revenue years prior to 2012 would not have been captured in the analysis. Spyker's decision not to include revenue from Alaska Clearing and Grinding in her valuation does not render the court's reliance on her analysis clearly erroneous.

Tamerra also argues that Spyker's analysis is undermined by the fact that some marital income was invested to stimulate the business's growth. While Tamerra is correct that such investment should be considered where present, the investment she references occurs when an entity's owner takes *less* than the salary they would normally be owed and uses the leftover proceeds to build the business.[45] David took up to $500,000 in owner draws in addition to paying Tamerra around $104,000 per year. David's reasonable compensation was calculated by Spyker to be closer to $200,000 per year. Spyker's reasoning on this point was supported by the record, and the court did not clearly err in relying upon it.

Tamerra correctly points out an inconsistency between the court's finding that Spyker's report was more persuasive because she used "the actual date of separation for her cutoff rather than year-end" and the court's earlier decision to value the business as of December 31, 2017, based on the parties' agreement.[46] But to the extent this part of the court's analysis is mistaken, it had no appreciable impact on the

---

[45]    *See Thiele*, 473 P.3d at 335-36.

[46]    Tamerra makes a related argument that Spyker's valuation was supposed to be through September 2017, but it only analyzed income earned through 2016. But Spyker testified she used end-of-year data from 2012 to 2016 to account for income variation throughout the year and tax adjustments. She considered internal financial statements through the end of August 2017 in her ultimate valuation of the business as of the parties' separation.

court's overall evaluation of the experts' respective analyses or on the court's valuation of ALC's active appreciation.

Spyker's report covers years 2012 through 2016 instead of 2013 through 2017, as Briskey's does. The revenue of the business varied substantially year to year, and 2012 and 2017 were lower revenue years in both analyses. The pre-tax income calculated by Briskey was $280,934 in 2017 and the net income calculated by Spyker was $256,685 in 2012. In contrast, in 2016 ALC had a net income of around $1,600,000. Given the year-to-year fluctuations and the fact that 2012 and 2017 featured similar income for the company, we do not see that Spyker's valuation method omitted any significant growth in the company.[47]

We reiterate that when presented with conflicting expert analysis, it is well within the trial court's role to consider and weigh the reliability and credibility of that expert evidence.[48] When, as here, the court presents detailed reasoning supported by the record for why it found one expert more credible, we will defer to that choice. Considering the court's careful weighing and detailed analysis, we see no clear error, and we affirm the court's valuation of ALC's active appreciation.

## C. The Superior Court's Award Of Attorney's Fees Was Not An Abuse Of Discretion.

Tamerra argues that the superior court abused its discretion when it did not award her full attorney's fees. "[I]n divorce cases, awards of attorney's fees are generally based not on prevailing party status but on the spouses' relative earning capacities and economic positions" because "[t]he purpose of awarding attorney's fees in divorce proceedings is to level the playing field" rather than to reward the prevailing

---

[47] *See Stevens v. Stevens*, 265 P.3d 279, 285 (Alaska 2011) ("We have held that the superior court's use of the date of separation as the valuation date was not an abuse of discretion where one party had dissipated marital assets.").

[48] *See Thiele*, 473 P.3d at 335.

party.[49]  When awarding attorney's fees, the court must consider the parties' earning capacities and separate resources, as well as the distribution of marital assets.[50]  The court also has the discretion to award enhanced attorney's fees if one party "has acted in bad faith or vexatiously."[51]  "If awarding enhanced fees, the court must first determine appropriate fees based on each parties' economic status and then increase the award based on a party's misconduct."[52]

Here, the court awarded Tamerra $100,000 in attorney's fees and costs in the final property division.  The court balanced Tamerra's extensive legal fees, her partial fault in garnering such high fees, and David's "distinct financial advantage" in reaching this final award.  Moreover, the court made the final award after having made several other interim awards:  $400,000 in April 2018, $74,020 in September through December 2020, and $10,518 for Rule 37 fees after discovery disputes.

This decision was squarely within the court's discretion.  Tamerra argues that the court did not consider her status as the economically disadvantaged spouse.  But the court clearly and repeatedly considered the financial disparity between the parties in making its fee decisions.

Tamerra also challenges the court's characterization of her use of the $400,000 pre-distribution award for living expenses other than attorney's fees.  To the extent she argues that she was not directed to use the pre-distribution award to cover her attorney's fees so that she could fairly litigate the divorce, she is mistaken.  Based on our review of the record, we agree with the court's finding that the award was meant, in main part, to assist with attorney's fees.  The court ordered the pre-distribution

---

[49]  *Thompson v. Thompson*, 454 P.3d 981, 997-98 (Alaska 2019) (second alteration in original) (quoting *Berry v. Berry*, 277 P.3d 771, 779 (Alaska 2012)).

[50]  *Id.*

[51]  *Id.* at 998.

[52]  *Id.*

payment to "level the playing field" because of David's access to significantly more resources than Tamerra. The court also ordered that David pay additional spousal support and denied Tamerra's request for additional attorney's fees. It was therefore reasonable for the court to characterize the initial $400,000 pre-distribution payment as being intended to support Tamerra's ability to litigate the case evenly with David. To the extent she argues the court clearly erred in finding she spent much of the $400,000 on her lavish lifestyle rather than attorney's fees, the record supports the court's finding.

Finally, Tamerra argues that the superior court failed to analyze whether enhanced fees were warranted. When awarding enhanced attorney's fees, the court must make explicit findings about whether one party acted in bad faith to support awarding enhanced fees.[53] Here, the court did not explicitly address Tamerra's arguments about whether David had behaved in bad faith. But it implicitly addressed those arguments when it found that both parties were aggressive litigators and that neither was "blameless." We observe no abuse of discretion in the court's partial attorney fee award.

### D. The Superior Court Did Not Err In Its Valuation Of The Active Appreciation Of The East 56th Avenue Property.

On cross-appeal, David challenges the superior court's valuation of the active appreciation of the East 56th Avenue property, arguing the court erred in finding that marital efforts increased the property's value and in relying on the overall property value in the MacSwain report. He further claims that the parties stipulated to the value of the improvements as being equivalent to the active appreciation.

The parties' arguments at trial focused primarily on whether the East 56th Avenue property was marital or separate; neither party presented specific expert testimony addressing active appreciation in the property's value. But based on the testimony presented, the court found that the East 56th Avenue property was David's

---

[53] *Berry*, 277 P.3d at 779-80.

separate property and that it had actively appreciated during the course of the marriage. The superior court also found that David failed to meet his burden to show an absence of causation between the demonstrated marital efforts related to the property and the increase in the property's value during the course of the marriage. After accounting for inflation, the superior court considered all other appreciation of the property to be active, valued that appreciation at $686,036, and awarded the property to David.

David first challenges the finding that *marital* efforts led to appreciation in the property's value. He contends that most, if not all, of the increase in value was due to his separate property, ALC. But that argument runs contrary to our precedent, which recognizes that *either* party may make contributions to the separate property, and so long as those efforts occurred during the marriage, they constitute marital contributions to the property's active appreciation.[54] Therefore, to the extent that David's marital efforts through his work for ALC contributed to the active appreciation of the property, this supports the court's finding.

Moreover, the court found that both David and Tamerra contributed to the various renovations to the property during the course of the marriage. The superior court's attribution of the property's active appreciation to both parties' marital efforts was supported by both MacSwain's and Tamerra's testimony.

David also challenges the court's methodology in calculating active appreciation. But the court correctly determined that it was David's burden to prove what proportion of the property's appreciation was due to active marital factors and what was due to market forces or other passive factors.[55]

---

[54] *See Hanson v. Hanson*, 125 P.3d 299, 305-06 (Alaska 2005) (holding husband's active efforts increased value of business only he owned and worked for and that this appreciation was marital property); *Brooks v. Brooks*, 733 P.2d 1044, 1054 n.22 (Alaska 1987) ("[A]ctive appreciation is the result of some affirmative action taken by one or both spouses which caused the increased value of the separate property.").

[55] *See Hanson*, 125 P.3d at 304.

David argues that the parties stipulated to the entire contents of MacSwain's report regarding the property, including that the value of "improvements," $125,000, captured the active appreciation of the property. But the record does not reflect that the parties stipulated to the amount of active appreciation. Indeed, the parties did not even mention active appreciation as related to the East 56th property; instead, their arguments focused on transmutation. Nor is it clear from the record that the expert's measure of "improvements" to the property is, or should be considered, the value of active appreciation in the property. Given that it was David's burden to prove the lack of connection between active marital efforts and the appreciation in the property's value, and given David's silence on the issue during trial, we see no clear error in the court's valuation of the property's active appreciation.

## V.   CONCLUSION

We AFFIRM the superior court's orders.